# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 03-1710

## WASTE MANAGEMENT OF CENTRAL LOUISIANA, ET AL.

## VERSUS

## ROBERT P. BEALL, ET AL.

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 170,750
HONORABLE WILLIAM ROSS FOOTE, DISTRICT JUDGE

**********

**ULYSSES GENE THIBODEAUX
CHIEF JUDGE**
**********

Court composed of Ulysses Gene Thibodeaux, C.J., Glenn B. Gremillion, and John B. Scofield[*], Judges.

**REVERSED AND RENDERED; ACTION DISMISSED.**

Henry B. Bruser, III
Michael J. O'Shee
G. Trippe Hawthorne
Gold, Weems, Bruser, Sues & Rundell
P. O. Box 6118
Alexandria, LA 71307-6118
Telephone: (318) 445-6471
COUNSEL FOR:
     Intervenors/Appellees - Lloyd O. Book, Jr., Michael Green, David Miller, Scott
     Perry, Jr., Sanitation Service, Inc., and J. Rax Garbage Disposal Service, Inc.,
     Individually and as Class Representatives

Albin Alexandre Provosty
John Dexter Ryland
John Patrick Doggett
Provosty, Sadler, deLaunay, Fiorenza & Sobel
P. O. Drawer 1791
Alexandria, LA 71309-1791
Telephone: (318) 445-3631
COUNSEL FOR:
     Secondary Defendant/Appellant - City of Alexandria
Allen J. Smith, Jr.

---

[*]Honorable John B. Scofield participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**Plauché, Smith & Nieset**
**P. O. Box 1705**
**Lake Charles, LA 70602**
**Telephone: (337) 436-0522**
**COUNSEL FOR:**

> **Plaintiffs/Appellants - Waste Management of Louisiana, L.L.C. and Waste Management Holdings, Inc.**

**Timothy Joseph Poche**
**Taylor, Porter, Brooks, & Phillips, L.L.P.**
**P. O. Box 2471**
**Baton Rouge, LA 70821**
**Telephone: (225) 387-3221**
**COUNSEL FOR:**

> **Plaintiffs/Appellants - Waste Management of Louisiana, L.L.C. and Waste Management Holdings, Inc.**

THIBODEAUX, Chief Judge.

Waste Management of Louisiana, Inc.,[1] the defendant in this class action, appeals a judgment adverse to it on the merits. The judgment declared a 1986 public contract between the City of Alexandria and Waste Management for the operation of the Alexandria Landfill valid only for 60 days after its signing, and null and void thereafter. The judgment awarded the class members $1,775,904.30, plus interest and attorneys' fees. The award was based on what the class claimants, as customers of Waste Management, paid Waste Management while it operated the landfill under the operating contract between 1986 and 1990, when the landfill closed. The amount of the award was a calculation of the profit from these customer payments that the trial court found Waste Management illegally obtained from a null public contract.

Procedurally, the class certification was ordered in 1998 and it arose out of incidental actions. The litigation out of which the incidental actions and the class action emerged, began in 1992 when Waste Management sued a former employer, Robert P. Beall, and a waste disposal contractor, The Omega One Company, for damages arising from the misuse of Waste Management's commercial customer information. Beall and Omega reconvened and filed a third party demand against the City of Alexandria. The reconventional demand and third party demand sought return of all money paid by Beall and Omega as customers of Waste Management during the approximate four-and-one-half years that Waste Management operated the Alexandria Landfill. Several more customers, including haulers of solid waste for hire, intervened and asserted the same demand. The reconventional demands and interventions grew

---

[1] At the start of this litigation, this party was Waste Management of Central Louisiana, a division of American Waste & Pollution Control Company. The parent corporation later changed its name to Waste Management of Louisiana, Inc. Another party, Waste Management, Inc., became a third party. Their interests are identical. In this opinion we refer to them collectively as Waste Management.

1

into a class action. The class was certified and defined as all customers of the Alexandria Landfill charged by Waste Management to deposit solid waste in that landfill from February 11, 1986 until its closure in September 1990. The original demand by Waste Management against Beall and Omega is no longer an issue.

On appeal, Waste Management seeks reversal of the judgment in its entirety. The class claimants answered the appeal, and ask that we find the landfill operating contract was never valid, not even for 60 days. They also ask that we increase the award to the total of Waste Management's receipts, not limited to its profit after expenses. For the following reasons, we find in favor of Waste Management and reverse the judgment in its entirety.

## I.

## **ISSUES**

Our decision rests on our resolution of two issues. The first is the efficacy of the 1986 Sanitary Landfill Operating and Maintenance Agreement (hereinafter "operating contract"), a public contract between the City of Alexandria and Waste Management effected under the emergency provisions of the city charter. This includes the duration of the contract, i.e., whether the term was limited by emergency ordinance to 60 days, or limited in duration only by the terms of the contract itself. The second issue is whether, under state law, the operating contract was subject to the requirement of the public bid laws.

II.

## BACKGROUND

For many years, solid waste in Alexandria and its environs was dumped in a landfill leased by the City known as the Alexandria Landfill. It was situated on Esler Road outside the City. This landfill was operated by the City and received garbage generated or collected by the City, as well as material delivered by private citizens and local waste haulers from Rapides Parish and elsewhere.

In the early 1980's the Louisiana Department of Environmental Quality (DEQ) began the process of enforcing mandated new standards for sanitary landfill operations across the state. The DEQ ordered the City to either upgrade its facility, which was being operated as an open dump, or close it in accordance with the new regulations. The deadline was January 20, 1986. City officials tried to get an extension of the closure order, as they had done in the past, but this time they were unsuccessful. There was no nearby alternate disposal site available. The City had neither the equipment nor the resources to haul the solid waste the considerable distance to another acceptable site. Nor did the City have the money to properly close the landfill, as it would ultimately have had to do. The DEQ made it clear that the only way the landfill would be allowed to continue in use past the deadline was if the City contracted with an established waste management company with the resources and expertise necessary to operate and close the landfill in accordance with regulatory standards. If the Alexandria Landfill had been shut down, there would have been no place for people to put their garbage.

Faced with this ultimatum, and unable to find anyone interested except Waste Management, the City Council, by Emergency Ordinance No. 13-1986 at its February 11, 1986 meeting, approved the operating contract with Waste Management. Immediately after the emergency ordinance was passed authorizing the operating

3

contract, the DEQ, which had a representative present at the council meeting, granted a closure extension. Under the operating contract's provisions, the City paid Waste Management a flat monthly fee of $18,750.00. In return, Waste Management provided all equipment and personnel necessary to operate and maintain the landfill; received for disposal from the City all waste collected by the City and properly put it in the landfill; and, effected closure of the landfill in accordance with regulatory standards.

The duration of the operating contract was until closure of the Alexandria Landfill, and that event was contemplated to coincide with completion and approval of a new sanitary landfill then being created by Waste Management. Waste Management operated the landfill for about four-and-one-half years, closing it on September 30, 1990.

III.

## STANDARD OF REVIEW

It is well settled that in civil cases, the appropriate standard for appellate review of factual determinations is the manifest error—clearly wrong standard, which precludes the setting aside of a district court's finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety. *Hall v. Folger Coffee Co.*, 03-606 (La. 4/14/04), 874 So.2d 90. An equally well-established principle of Louisiana law is that all legal issues are subject to the de novo standard of review. *Id.*

### *The Validity and Duration of the Operating Contract*

The trial court found that the Operating Contract was the result of a valid exercise of the City's power to enact an emergency ordinance. The court found, however, that its duration was only 60 days. Our discussion of these findings will be broken down into four subjects: (a) did the City observe the formalities for passage of an emergency ordinance; (b) was there an emergency; (c) was this the grant of a franchise in violation of the city charter and La.R.S. 33:4169.1; and, (d) was the term of the contract limited to the term of the ordinance?

### (a) Did the City observe the formalities for passage of the emergency ordinance?

The Alexandria Home Rule Charter, Article II, §2-12, provided that action by the city council authorizing any contract on behalf of the City had to be by ordinance. The next section, §2-13, sets out the regular procedure for introduction, publication, a laying over period, a public hearing, adoption, and the effective date, for ordinances in general. Another provision, §2-14(A), authorizes the city council to adopt an emergency ordinance "[t]o meet a public emergency affecting life, health, property, or public safety," and allowed such an ordinance to be adopted at the same meeting at which it was introduced. The trial court found that the City complied with the formal requirements of its charter in enacting the emergency ordinance. We agree.

### (b) Was there an emergency?

Similarly, there is no manifest error in the trial court's factual conclusion that the City faced an emergency. Jon Grafton, the City Clerk, testified that he was operating under the impression that the DEQ would not wait for approval of a contract by ordinary ordinance which would take 45 days or more. As pointed out earlier, a DEQ representative was present at the council meeting when the City adopted the

5

emergency ordinance. The trial judge found that emergency conditions existed that allowed entering into a contract "without the normal required notices, hearings and formalities." In their answer to the appeal, the only serious argument that the class claimants make to overturn this factual finding is that the emergency was of the City's own making. That does not at all appear to have been the case, but even if it were, we cannot believe that the City would lose its power to respond to emergencies that would affect the public health, property, and safety just because prior governmental inaction may have contributed to the emergency. The clear purpose of the charter provision was to protect the public, not to punish the public because public officials failed to foresee the ultimate threat to the public health, property, and safety that the garbage crisis was to become. The factual conclusion of the trial court that there was an emergency is supported by the record, and the class members have not been able to convince us that this finding was clearly wrong.

### (c) Was this a grant of a franchise in violation of the City Charter and La.R.S. 33:4169.1?

Implicit in the trial court's finding that the city council complied with the formal procedural requirements and that an emergency existed was its finding that the operating contract was not the grant of a franchise. The same charter provision that dealt with emergencies, §2-14(A), prohibited the use of an emergency ordinance "to grant or extend a franchise." In the light of its ordinance, therefore, the city council could not have let the operating contract to Waste Management even for 60 days if the contract was a franchise. The trial judge's recognition that the contract was valid for 60 days equates to a finding that it was not a franchise. We agree.

The definition of "franchise" in BLACK'S LAW DICTIONARY 658 (6th Ed. 1990) is:

6

A special privilege to do certain things conferred by government on individual or corporation, and which does not belong to citizens generally of common right; *e.g.*, right granted to offer cable television service.

Certainly this was not the grant of an exclusive franchise. This circuit in *Gordon's Const. & Landfill, Inc. v. Iberia Parish Government*, 01-1244 (La.App. 3 Cir. 2/6/02), 815 So.2d 991, dealt with the issue of whether Iberia Parish granted an exclusive franchise when it entered into a solid waste collection and disposal contract. The contract itself said it was "for a non-exclusive franchise within the territorial jurisdiction of the Owner [Iberia Parish]." *Id*. at 993. We found that it was not an exclusive contract because there were many reservations of rights by the parish under the general conditions of the contract. Similarly, in this case the operating contract conferred no exclusive rights and it did not prevent the City of Alexandria or any other entity from engaging in similar activity.

There is a statutory basis for upholding the City's action in this case. Louisiana Revised Statutes 33:4169.1 is a special statute expanding the powers of municipalities and parishes and giving them specific authority to deal with garbage and trash. The statute's language pertinent to our inquiry is:

A. The governing authority of every parish or municipality shall have the following powers:

(1) To engage in the collection and disposal of garbage and trash within its jurisdiction in cooperation with, or to the exclusion of, other garbage and trash collectors.

(2) To grant permits, licenses, exclusive or nonexclusive franchises, or any combination thereof to garbage and trash collectors and disposers. Any exclusive franchise shall be granted only after advertising for bids, reception of bids, and awarding of the contract or contracts in accordance with the public bid laws of the state and other provisions of law.

(3) To enter into time contracts for the collection and transportation of garbage or trash for a term of up to ten

7

years, and for disposal of garbage or trash for a term of up to twenty-five years.

Subsection A(3) authorizing public bodies to enter into time contracts for the collection, transportation, and disposal of garbage or trash is a separately-enumerated power from the preceding subsection A(2), which empowers the same political subdivisions to grant permits, licenses, exclusive or nonexclusive franchises, or any combination thereof to garbage and trash collectors and disposers. A well-known presumption is that every word, sentence, or provision in a law is intended to serve some useful purpose, that some effect is to be given to each such provision, and that no unnecessary words or provisions were used. La.Civ.Code art. 9. *A.K. Durnin Chrysler-Plymouth, Inc. v. Jones*, 01-1810 (La.App. 1 Cir. 5/10/02), 818 So.2d 867. We interpret the above subsections of the statute to mean that permits, licenses, and franchises in A(2) are not the same things as time contracts in A(3). Our analysis of the terms and conditions of the operating contract at issue here convinces us, as it apparently did the trial judge, that it did not confer a franchise. In the terms of La.R.S. 33:4169.1, it granted a time contract for the collection, transportation, and disposal of garbage or trash.

We are of the opinion, as was the trial judge, that this was not a franchise. Besides never using the word "franchise" in its language, the operating contract had no territorial jurisdictional application. The Alexandria Landfill was located outside the city limits. While a franchise could conceivably be granted without calling it a franchise, it is worth mentioning that during the trial none of the witnesses for the parties to the agreement, the City and Waste Management, used the term "franchise" in referring to the contract. The city attorney at the time testified that he did not consider it to have been the granting of a franchise. The minutes of the city council meeting show there was no authority voted to grant a franchise and the emergency

8

ordinance itself did not say a franchise was authorized. The essential character of the operating contract was a time contract for the collection, transportation, and disposal of garbage or trash. There is no error in the trial court's finding that this was not a franchise.

**(d) Was the term of the contract limited to the term of the ordinance?**

The trial judge concluded that the ordinance was valid as an emergency ordinance but only for 60 days. This conclusion was based on the language of Charter Article II, §2-14 (C) which states that "[e]mergency ordinances shall be effective for no longer than sixty (60) days." The trial court interpreted this time limitation to apply not only to the ordinance itself, but also to any action taken or contract executed pursuant to the ordinance. Interpreting the contract duration to be coterminous with the ordinance authorizing it, the trial court reasoned that the contract ended 60 days after the emergency ordinance was adopted. After that, concluded the court, the contract was null and void. Because Waste Management nevertheless continued to operate the landfill for four-and-one-half years before it closed it, the trial court awarded the class members the return of the profit made by Waste Management during that time on the null and void contract.

It was error to interpret the emergency ordinance as precluding the execution of a contract for a term of greater than 60 days. Both the city attorney and the city clerk testified that the city authorities interpreted the 60-day provision of the emergency ordinance as the window of time during which the city council could take action authorized by the ordinance, not as a time limitation on the action itself. In this case, the action to be taken was a time contract for the operation of the landfill. As pointed out earlier, the contract's provisions regarding its term contained no fixed termination date, but the language quite clearly envisioned a term far longer than a

9

mere 60 days and, by those same terms, the contract in fact lasted four-and-one-half years. The contract itself is additional evidence that the city council interpreted its ordinance to authorize a contract beyond 60 days.

The interpretation given a city ordinance by a municipal authority is entitled to great weight. A reviewing court should not overturn such a determination unless it is clearly wrong or unless a different construction is clearly required. *Kneipp v. City of Shreveport*, 550 So.2d 748 (La.App. 2 Cir. 1989).

The City was not clearly wrong in distinguishing an emergency ordinance from a contract executed pursuant to the ordinance. Laws are to be construed as having the meaning that best conforms to the purpose of the law. La.Civ.Code art. 10. The purpose of Charter Article II, §2-14, was to enable the city to fully and effectively respond to emergency situations. The only way that the city could respond to its waste disposal emergency was to keep its landfill in operation until it could be properly closed, and the only way that it could do that was by means of this contract. A 60-day contract, even if a contractor could have been found willing to gear up for such a short term, would not have been an effective response to the emergency; it would have merely postponed it and the City may not have received DEQ's approval which could have resulted in immediate closure of the landfill. The interpretation given its ordinance by the City meets the test of common sense. We conclude that the City had the authority under its emergency ordinance to enter into a contract with Waste Management for the term expressed in the contract.

### *The Application of Public Bid Laws*

The trial court made an express finding that this operating contract was subject to public bid requirements to extend past 60 days from its emergency letting. In its reasons for judgment, the trial court said:

> The contract was subject to public bid requirements to extend past the 60 days provided in the emergency doctrine. Those requirements were not followed. The Contract was a nullity on the 61st day.

Thus, the trial judge ruled that the contract beyond 60 days was invalid for two reasons: first, it could not outlive the emergency ordinance and, second, the letting of a longer contract required compliance with public bid laws.

We have already demonstrated that the contract was not limited to the life span of the emergency ordinance. We will now explain why the contract did not require public bids.

Louisiana Revised Statutes 38:2212 (A)(1)(a) provides:

> All public work exceeding the contract limit as defined in this Section, including labor and materials, to be done by a public entity shall be advertised and let by contract to the lowest responsible bidder who had bid according to the contract, plans, and specifications as advertised, and no such public work shall be done except as provided in this Part.

The preceding section, La.R.S. 38:2211 (12) defines "public work:"

> (12) "Public work" means the erection, construction, alteration, improvement, or repair of any public facility or immovable property owned, used, or leased by a public entity.

This definition was added in 1991. Prior to 1991, "public work" was jurisprudentially defined. *Wallace Stevens, Inc. v. Lafourche Parish Hospital, District No. 6*, 323 So.2d 794, 796 (La.1975), interpreted the term to mean "a building,

physical improvement, or other fixed construction. It does not include telecommunication services that may be provided in a building or in connection with its use." Using that definition, the court in *Browning-Ferris, Inc. v City of Monroe*, 465 So.2d 882 (La.App. 2 Cir.), *writ denied*, 467 So.2d 538 (La.1985), held that an operating contract for a landfill between the City of Monroe and a waste company was a contract for services and not a public work, and that the public bid law was not applicable. The contract provided that the waste company would operate and maintain the landfill site at its sole cost and expense, including construction costs and other items necessary for the normal operation of a sanitary landfill, while the City of Monroe, in return, would deposit its trash and garbage at the landfill at a rate of $8.95 per ton. Similarly, the operating contract in our present case provided that Waste Management, at its expense, would perform the maintenance and operational services at the landfill in accordance with the Closure Order, furnish personnel and equipment necessary for the performance of these services, and receive from the City of Alexandria all waste collected by the City. For these services the City of Alexandria paid Waste Management a flat monthly fee of $18,750.00.

As it applies to the particular facts of this case, the operating contract herein was not a "public work" when tested under the 1991 statutory definition of that phrase any more so than it was under the jurisprudential definition. The landfill was a public facility on immovable property leased by the City, but the work could hardly be construed as "the erection, construction, alteration, improvement, or repair" of that facility. The words of a law must be given their generally prevailing meaning. La.Civ.Code art. 11. A public dump is an "erection" only in the sense that it will get greater in size as waste is added to it. A mound of garbage and trash is not a "construction" except in the same sense of an increase in size. In this sense, garbage added to garbage is somewhat like zero added to zero. The mass of garbage steadily

12

increasing is perhaps an "alteration" in appearance, but not in any other way, and surely it is not an "improvement." The generally prevailing meaning of the word "repair" does not include the maintenance, operation, or closure of a landfill.

The legislative definition of "public work" enacted in 1991 comfortably accords with "a building, physical improvement, or other fixed construction" as applied to a landfill in the process of closing under DEQ mandated rules. The jurisprudential definition was the law in effect when the operating contract was performed and the landfill was closed. Under either definition, the maintenance, operating services, and closure of the landfill was not a public work and public bids were not required.

IV.

**JUDGMENT**

For the foregoing reasons, the judgment of the trial court is reversed. Judgment is rendered in favor of Waste Management of Louisiana, Inc., and Waste Management, Inc., and against the class plaintiffs dismissing the class action, all reconventional demands, and all interventions. Costs, both here and below, will be paid equally by Reconvenors and Intervenors.

**REVERSED AND RENDERED; ACTION DISMISSED**.

13