Deborah RANDALL, Stillwater Ladies, Inc., Barbara J. Wright, David Wright, Flamingo Express, Inc., Robin Allanson, Leo Neudecker, Audrey Hoglund–Ross, Angie Weeks, and Michelle Evans, Plaintiffs,

v.

LADY OF AMERICA FRANCHISE CORPORATION, Defendant.

No. 04–CV–3394 (PJS/RLE).

United States District Court, D. Minnesota.

July 24, 2007.

J. Michael Dady and Scott E. Korzenow-ski, Dady & Garner, PA, for plaintiffs.

Robert Zarco, Robert M. Einhorn, and Himanshu Patel, Zarco Einhorn Salkowski & Brito, PA; Lawrence R. Commers and Tim A. Staum, Mackall, Crouse & Moore, PLC, for defendant.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PATRICK J. SCHILTZ, District Judge.

This matter is before the Court on the summary-judgment motion of defendant Lady of America Franchise Corporation ("Lady of America"). Lady of America asks the Court to enter judgment in its favor on all of plaintiffs' claims against it and on its breach-of-contract counterclaims against plaintiffs.[1] For the reasons that follow, the Court grants in part and denies in part Lady of America's motion.

## I. BACKGROUND[2]

Lady of America is a Florida company that sells franchises for fitness centers marketed specifically to women. Larger fitness centers operate under the "Lady of America" name, while smaller centers use the name "Ladies Workout Express." The market for women-only fitness centers was largely created by, and is still dominated by, the Curves brand.

Plaintiffs in this case are disappointed current and former Lady of America franchisees. All of the plaintiffs opened Ladies Workout Express franchises in Minnesota. Most of the plaintiffs closed their franchises after finding them to be unprofitable.

In the course of negotiating with Lady of America to become franchisees, all of the plaintiffs received a document called the "Uniform Franchise Offering Circular" ("UFOC"), which includes information that Lady of America is required to provide to prospective franchisees under state and federal franchise laws. All of the plaintiffs—with the possible exception of Deborah Randall[3]—also entered into a franchise agreement with Lady of America. That contract governed the franchisor-franchisee relationship. Because the franchise agreements signed by the various plaintiffs were essentially identical, the Court will refer generally to "the franchise agreement."

Plaintiffs allege that Lady of America duped them into becoming franchisees by misleading them in various ways. Plaintiffs seek to have their franchise agreements rescinded, to be relieved of any obligations to Lady of America, and to recover compensatory damages from Lady of America. Plaintiffs have filed a "kitchen-sink" complaint, raising numerous claims under Minnesota and Florida law. For its part, Lady of America denies liability, and argues that *it* is the real injured party because plaintiffs failed to honor their obligations as franchisees.

---

**1.** One plaintiff, Robin Allanson, has filed for bankruptcy. *See In re Allanson*, No. 05–80772 (Bankr.D.Minn.). Proceedings with respect to Allanson are therefore automatically stayed under 11 U.S.C. § 362. Allanson's company, Flamingo Express, Inc., is also a party to this action. Neither Lady of America nor plaintiffs have addressed the effect (if any) of the Allanson stay on Flamingo Express's participation in the case.

**2.** Many of the facts are hotly disputed. The Court recounts the facts in the light most favorable to plaintiffs.

**3.** Randall testified at her deposition that she did not recall executing a franchise agreement, although she did receive a draft agreement that was attached to the UFOC. Randall Dep. at 134–36; Randall Aff. ¶ 15 & Ex. 1 at DR00148–86. Lady of America has introduced no evidence of a franchise agreement signed by Randall.

Lady of America's defenses to all of plaintiffs' claims rely heavily on the terms of the UFOC and the franchise agreement, and thus, before turning to the factual allegations underlying plaintiffs' claims, the Court will set out the critical language from those two documents. The franchise agreement's integration clause provides in relevant part:

> This Agreement, its exhibits and the Manual, as the Manual may be revised as permitted in this Agreement, comprise the entire agreement of the parties and supersede all prior representations and agreements with respect to its subject matter. No representations have been made to induce execution of this Agreement that are not included. The Agreement may not be amended or waived and no representations may be made by the Franchisor, except as stated in this Agreement or in writing signed by the Franchisor's President.

Wright Aff. Ex. 1 at MIN0001531 [Docket No. 109].

The last section of the franchise agreement, § 12.2 (entitled "Representations"), includes the following disclaimer: [4]

> The franchisee and all persons signing with or for him or her acknowledge that they have conducted an independent investigation of the system and this business venture; this agreement involves a high degree of business and financial risk; and its success will be largely dependent on their ability as independent businesspersons, their financial strength and local market conditions. The franchisee has investigated his or her trade area and believes it will support the business venture. The franchisor expressly disclaims the making of, and the franchisee acknowledges that he or she has not received, any promises or representations, express or implied, orally, in writing or otherwise of assistance, expenses, benefits, sales volumes, profits, success or any other matter except as expressly made in this agreement or the franchisor's franchise offering circular. If any promises or representations have been made, the franchisee must list them below. The franchisor is relying on the franchisee to see that all matters are included in writing in this agreement, if they are not, the franchisee will not be able to rely in any way on any promises or representations and the franchisor will not be bound by them. The franchisee acknowledges that the franchisee has had ample time to consult with advisors of his or her own choosing about the potential benefits and risks of this agreement and that he or she has read and understood it.

*Id.* at MIN 0001533–34.

In addition, Item 19 of the UFOC (entitled "Earnings Claims") includes the following disclaimer of representations about franchisees' potential success:

> We do not furnish or authorize [our] salespersons to furnish any oral or written information concerning the actual or potential sales, costs, income or profits of your Franchise. Actual results vary from Franchise to Franchise, and we cannot estimate the results of any particular franchise.

*Id.* at MIN0001488. This type of "negative earnings claim" is contemplated under the rules governing UFOCs. *See* North American Securities Administrators Association, *Uniform Franchise Offering Cir-*

---

4. Section 12.2 is in all capital letters in the franchise agreement. For the sake of legibility, the Court reproduces the relevant language here in upper and lower case. *See* Ruth Anne Robbins, *Painting With Print: Incorporating Concepts of Typographic and Layout Design into the Text of Legal Writing Documents,* 2 JALWD 108, 115–18 (2004) (discussing why text in all capital letters is hard to read).

*cular Guidelines—1993 and Commentary,* Item 19—Earnings Claims, Bus. Franchise Guide (CCH) ¶ 5,771 (adopted April 25, 1993) ("An earnings claim made in connection with an offer of a franchise must be included in full in the offering circular and must have a reasonable basis at the time it is made. If no earnings claim is made, Item 19 of the offering circular must contain the negative disclosure prescribed in the instruction.").

As noted above, all franchisees received the UFOC, and all (save perhaps Randall) signed the franchise agreement. Selected facts alleged by each plaintiff are set forth below.

### A. David and Barbara Wright

David Wright and his wife, Barbara Wright, began looking into opening a women-only fitness center in the summer of 2002. Wright Aff. ¶ 4. David contacted a Lady of America representative by telephone and was told that, if he was interested in becoming a franchisee, he would have to act quickly because Minnesota franchises were being bought up rapidly. *Id.* ¶¶ 4–5.

In June 2002, David flew to Florida to attend "Discovery Day"—an event sponsored by Lady of America to inform and motivate potential franchisees. *Id.* ¶ 6. At Discovery Day, Lady of America's Marketing Director, Jeff Green, told David that he could expect to have 125 to 150 members when his franchise opened, and eventually to make $22,000 per month in profits. *Id.* ¶ 8. Another Lady of America representative, Larry Sargent, told David that he could expect to sign up 100 to 150 members when opening a franchise, and to add 15 to 20 members per week thereafter. *Id.* ¶ 11. Sargent predicted that David would be in great financial shape within a few months after opening his franchise. *Id.*

Sargent also showed David financial statements of existing franchises and said that David should anticipate similar revenues. *Id.* ¶ 12. Sargent claimed that some Puerto Rico franchises took in about $23,000 per month. *Id.* ¶ 14. Unnamed Lady of America representatives showed David statements reporting that some high-performing ("Top Ten") franchises were generating revenues of over $10,000 per month. *Id.* ¶ 13. Another unnamed representative took David on a tour of a Ladies Workout Express franchise in Deerfield Beach, Florida, and said that the franchise had revenues of over $40,000 per month, and that David could expect to have a similarly successful franchise in Minnesota. *Id.* ¶ 16.

David received a UFOC at Discovery Day. *Id.* ¶ 17. After he returned to Minnesota, he hired an attorney to review the UFOC. D. Wright Dep. at 44. David and Barbara executed a franchise agreement in August 2002 that gave them the right to open a Ladies Workout Express in Maplewood, Minnesota. *Id.* ¶ 18.

The Wrights opened their Ladies Workout Express in February 2004. *Id.* Their buildout costs exceeded the estimates made by Lady of America representatives. *Id.* ¶ 19. Their membership and revenue numbers were lower than the numbers given by Lady of America representatives at Discovery Day. *Id.* ¶ 20. The Wrights closed their doors in the summer of 2004, after having been open only a few months. *Id.* ¶ 22. According to the Wrights, Lady of America never delivered on promises of operational and advertising support. *Id.* ¶ 21.

### B. Michelle Evans

Plaintiff Michelle Evans, like the Wrights, began investigating the possibility of opening a women-only fitness center in the summer of 2002. Evans Aff. ¶ 2 [Docket No. 110]. She filled out an online form at the Lady of America website to request information about its franchises.

*Id.* ¶ 5. A Lady of America representative, Elliot Melement, contacted Evans in response. *Id.* ¶ 6.

Melement told Evans that she would have to act quickly if she wanted a Minnesota franchise because they were in great demand. *Id.* ¶ 8. Melement told Evans that she could expect to have 100 members signed up before her store opened. *Id.* ¶ 7. Melement said that other Minnesota Ladies Workout Express franchises were very successful. *Id.* Mark Camara of Lady of America later confirmed Melement's statements and reiterated that Ladies Workout Express franchises in Minnesota were going fast. *Id.* ¶¶ 10–11.

Melement recommended a location in Blaine, Minnesota, and told Evans that she would have to act quickly if interested in that location because another potential franchisee, Robin Allanson, was also interested in the location. *Id.* ¶ 14. Allanson, however, swears that she never discussed a Blaine location with Lady of America. Allanson Aff. ¶ 3 [Docket No. 108].

Evans did not pursue the Blaine location. Instead, Evans contacted the owners of an existing Ladies Workout Express in Roseville, Minnesota, who were looking to sell their franchise. Evans Dep. at 23–24. At the time—around September 2002—the Roseville club had been open for a few months and had about 80 members. The club was not profitable. *Id.* at 27–28, 31. Evans believed that the club's membership numbers, which were lower than the opening numbers predicted by Melement, could be explained by the owners' failure to advertise properly. *Id.* at 29–31.

Evans purchased the Roseville club from its owners in November 2002. Evans Dep. at 54–55. She hired an attorney to assist with the purchase and to review the franchise agreement. *Id.* Evans paid Lady of America both a $5,000 transfer fee and a $12,500 franchise fee associated with her purchase of the Roseville club. Evans Aff.

¶¶ 19–20. Around March 2003, Evans executed a franchise agreement with Lady of America. *Id.* ¶ 18. After operating her Ladies Workout Express location for a little over three years, Evans closed the franchise in December 2005. Evans Dep. at 64.

## C. Leo Neudecker

Plaintiff Leo Neudecker began looking into opening a women-only fitness center in early 2002. Neudecker Aff. ¶ 2 [Docket No. 111]. Neudecker had owned and operated a successful produce-distribution business since 1992. Neudecker Dep. at 7–8. By early 2002 he had turned that business over to his sons, and he was looking for a new venture in which to invest his time and money. *Id.* at 19–20.

In about June 2002, Neudecker spoke with Lady of America representative Mark Camara about Lady of America franchises. *Id.* at 23–24. Camara encouraged Neudecker to come to Florida for a Discovery Day presentation and to do so quickly, as Minnesota franchise opportunities were selling out. *Id.* at 24–25. Later that month, Neudecker attended Discovery Day in Florida. Neudecker Aff. ¶ 7.

Neudecker was told that, if he signed up for a Ladies Workout Express franchise, he could expect to enroll 100 members before opening the franchise and would break even after enrolling 110 to 120 members. *Id.* ¶ 8; Neudecker Dep. at 37–46. Neudecker was told that he could expect to break even within about six months. Neudecker Dep. at 45–46. In addition, Neudecker was shown a slide presentation that suggested that many Lady of America locations had 500 to 1,000 members and that all existing locations were profitable. *Id.* at 44; Neudecker Aff. ¶ 9.

After attending Discovery Day in June 2002, Neudecker purchased the right to open four franchises for $25,000. (The single-location franchise fee was $12,500,

but franchisees who paid twice that amount received a "four-pack" of licenses.) Neudecker Dep. at 57–58. He received a UFOC in July 2002; he also signed a franchise agreement on July 15, 2002. Neudecker Aff. ¶ 10 & Ex. 1 at MIN0001211; Neudecker Dep. at 70, 119–20.

Neudecker opened only two of the four franchises to which he had purchased rights. In about November 2002, he opened a Ladies Workout Express in Crystal, Minnesota. A few months later, in about February 2003, he opened a second location in Mounds View, Minnesota. Neudecker Aff. ¶¶ 14–15. The Crystal location, at its peak, had about 120 members; the peak membership at Mounds View was about 70 members. Neudecker Aff. ¶ 19. Neither location ever broke even. Neudecker Aff. ¶ 18. Neudecker closed both locations in November 2003. Neudecker Dep. at 83.

### D. Deborah Randall[5]

Plaintiff Deborah Randall began looking into opening a women-only fitness center in early 2002. Randall Aff. ¶ 2 [Docket No. 112]. In about March 2002, she spoke by telephone with Bill Landman, then a Senior Vice President at Lady of America. Landman said that if Randall acquired a Ladies Workout Express franchise, she could expect 100 new members on opening, would recover her investment within three months, and would be profitable within six months. Id. ¶ 4. Lady of America representatives Mark Camara and Ann Power confirmed these assertions, id. ¶¶ 6–7, and Randall viewed a Discovery Day slide presentation over the Internet that included slides suggesting that all existing Lady of America franchises had become profitable within six months. Id. ¶ 12. Further, Power assured Randall that Lady of

America was superior to its competitor Curves. Id. ¶ 9.

Landman, Power, and Camara told Randall that because Minnesota locations were being bought up rapidly, Randall would need to act fast if she wanted to become a franchisee. Id. ¶ 10. Power told Randall that she could expect to invest $25,000 to $30,000 to open a Ladies Workout Express. Id. ¶ 11.

Randall received a UFOC in early 2002. Id. ¶ 14. The UFOC included, as an attachment, a sample franchise agreement, id. Ex. 1 at DR00148–87, but Randall does not remember actually executing a franchise agreement. Randall Dep. at 134–36; Randall Aff. ¶ 15. She asked an attorney friend of hers to review the UFOC, and he did not raise any concerns about it. Randall Dep. at 54. In April or May 2002, Randall paid a first franchise fee of $12,500, and in June 2002 she paid an additional $12,500 for the right to open another three franchises. Randall Dep. at 86, 96–98.

Randall opened her first (and only) Ladies Workout Express location in August or September 2002 in Stillwater, Minnesota. Randall Aff. ¶ 17; Randall Dep. at 76. Randall signed up only 15 members before opening her club, and her membership numbers peaked at 170 to 180. Randall Aff. ¶ 19. Randall did not break even after three months, as promised. Id. She eventually closed her doors in April 2004. Randall Dep. at 82.

### E. Audrey Hoglund–Ross and Angie Weeks

Audrey Hoglund–Ross and her daughter, Angie Weeks, became interested in opening a women-only fitness center in 2001. Hoglund–Ross Aff. ¶¶ 1–2 [Docket

---

**5.** Deborah Randall's company, Stillwater Ladies, Inc., is also a plaintiff. For simplicity, the Court will discuss only Randall herself in this opinion. Stillwater Ladies' claims will meet the same fate as Randall's.

No. 113]. After reviewing information on the Lady of America website and contacting company representatives, Hoglund–Ross attended a Discovery Day in August 2001. *Id.* ¶ 10. Hoglund–Ross alleges that the Lady of America website assured her that she could expect $100,000 in pre-opening sales. *Id.* ¶ 5.

At Discovery Day, Hoglund–Ross saw presentations that suggested that all existing franchisees were profitable. *Id.* ¶ 11. Representatives of Lady of America told Hoglund–Ross that she could expect to make $30,000 per month in profits after being in business for six months. *Id.* ¶ 12. Hoglund–Ross was told she would be "driving a Mercedes" within six months after opening a Ladies Workout Express. *Id.*

Around August 2001, Hoglund–Ross and Weeks received a copy of the UFOC. *Id.* ¶ 15. Hoglund–Ross had an attorney at a large Minneapolis law firm review the UFOC. Hoglund–Ross Dep. at 53–54. In late November 2001, Hoglund–Ross and Weeks signed a franchise agreement with Lady of America. *Id.* ¶ 17. They paid a $12,500 franchise fee for the right to open a store in Columbia Heights, Minnesota. *Id.* ¶ 18. They opened their Columbia Heights location in February 2002. *Id.* ¶ 19.

Also in February 2002, while a representative of Lady of America was in Minnesota to assist Hoglund–Ross and Weeks with pre-opening membership sales, relatives of Hoglund–Ross and Weeks decided to pay an additional $12,500 franchise fee, giving the family the right to open three more clubs. *Id.* ¶ 21. Hoglund–Ross and Weeks opened the second club in New Brighton, Minnesota, in January 2003. *Id.* ¶ 24. Rights to the third and fourth of the four franchises went to Hoglund–Ross and Weeks's relatives. *Id.* ¶ 21–22.

Hoglund–Ross and Weeks closed their Columbia Heights location in January 2006. *Id.* ¶ 29. At the time, the club had about 140 members. *Id.* Their New Brighton club is apparently still in operation.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party. *Ohio Cas. Ins. Co. v. Union Pac. R.R.,* 469 F.3d 1158, 1162 (8th Cir.2006). In considering a motion for summary judgment, a court must assume that the nonmoving party's evidence is true. *Taylor v. White,* 321 F.3d 710, 715 (8th Cir.2003).

### B. Minnesota Franchise Law (Plaintiffs' Count I)

In Count I of their first amended complaint [Docket No. 13], plaintiffs allege that Lady of America violated sundry Minnesota laws and regulations governing the sale of franchises. Plaintiffs' allegations can be grouped in three general categories: (1) Lady of America made false claims about earnings—that is, about the revenues and profits of existing and potential franchises, including the potential franchises that were eventually sold to plaintiffs; (2) Lady of America failed to disclose rebates or "kickbacks" that it received from vendors who sold products to franchi-

sees; and (3) Lady of America pressured plaintiffs to act quickly by falsely claiming that available franchises in Minnesota were rapidly being purchased.[6] The Court will address each category in turn.

### 1. Earnings Claims

#### a. Plaintiffs' Claims

At least some of the plaintiffs allege that Lady of America, through its representatives or in its Discovery Day materials, predicted that franchisees could expect particular levels of profitability. Some plaintiffs also allege that Lady of America provided information about the revenues and profitability of existing Lady of America franchises. Plaintiffs apparently allege that some earnings claims were outright false and that other earnings claims were misleading because Lady of America omitted material facts. First Am. Compl. ¶¶ 259, 269.b.-.c.

Franchisors are forbidden to make false or misleading representations by Minnesota Franchise Act § 80C.13, subdivision 2, which provides:

> No person may offer or sell a franchise in this state by means of any written or oral communication which includes an untrue statement of a material fact or which omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

Minn.Stat. § 80C.13 subd. 2.

The UFOC that Lady of America filed with the state and provided to plaintiffs disavows any earnings claims as to prospective franchisees' actual or potential earnings, stating:

> We do not furnish or authorize [our] salespersons to furnish any oral or written information concerning the actual or potential sales, costs, income or profits of your Franchise. Actual results vary from Franchise to Franchise, and we cannot estimate the results of any particular franchise.

Wright Aff. Ex. 1 at MIN0001488. The first sentence of this UFOC paragraph is an assertion of fact—and, if Lady of America did indeed "furnish ... information" about a prospective franchisee's potential sales, costs, income, or profits, the first sentence is a *false* assertion of fact. Alleged earnings claims by Lady of America could thus violate subdivision 2 of § 80C.13 in two ways: First, Lady of America could have violated the statute if it made earnings claims that were *false*. Second, Lady of America could have violated the statute if it made earnings claims that were *true*. If Lady of America made earnings claims—even true earnings claims—then its assertion in the UFOC that it does not make *any* earnings claims is false. Plaintiffs appear to raise both of these arguments. Compl. ¶¶ 266, 269.c.; Pl. S.J. Opp. at 26–29.

Plaintiffs further allege that by making unsubstantiated earnings claims that were not included in the UFOC filed by Lady of America with the state and provided to plaintiffs, Lady of America violated a number of other relevant statutes and rules. First Am. Compl. ¶¶ 262–63, 269.d-.e.; Pl. S.J. Opp. at 26–29. For example, under Minnesota Rule 2860.4500, a franchisor commits a "false, fraudulent, or deceptive practice" if the franchisor makes or causes to be made any statement or representation:

---

**6.** Plaintiffs' First Amended Complaint also alleges that Lady of America failed to register with Minnesota as required by state law. First Am. Compl. ¶¶ 260, 269.a. Plaintiffs have agreed to dismiss this claim. Pl. Mem. Opp. Def. Mot. S.J. at 1 n. 1 [Docket No. 114] ("Pl.S.J.Opp.").

(1) that is contrary to any disclosure made in the public offering statement [i.e., the UFOC]; or

(2) with regard to ... projections of operations or of income or gross or net profits capable of being obtained from operation of the franchise by the franchisee without written disclosure of the number of the franchisor's existing franchised businesses that have, to the franchisor's knowledge, actually attained that projected level[.]

Minn. R. 2860.4500(B). Plaintiffs assert that Lady of America violated this rule.

The Court has doubts about whether Rule 2860.4500 can be remedied through civil suits by franchisees. True, as a general matter, a franchisor may be held liable to a franchisee for violations of rules promulgated under the Minnesota Franchise Act.[7] But Rule 2860.4500, by its terms, simply defines the phrase "a 'false, fraudulent, or deceptive practice' within the meaning of Minnesota Statutes ... sections 80C.12 and 80C.13...." The phrase "false, fraudulent, or deceptive practice" actually occurs only in Minnesota Statutes § 80C.12, which governs the state's ability to shut down a franchisor. Under subdivision 1(c) of § 80C.12, the state may shut down a franchisor that is engaging (or is about to engage) in "false, fraudulent or deceptive practices in connection with the offer and sale of a franchise...." Section § 80C.12 does not, however, confer any rights on franchisees.

Lady of America has not made this argument, though, nor has it made any other argument specific to plaintiffs' claims under Rule 2860.4500. The Court therefore assumes, without deciding, that franchisors who engage in "false, fraudulent, or deceptive practices" can be held liable for those

practices in an action brought by franchisees.

Plaintiffs also seem to allege that by making earnings claims, Lady of America violated Minnesota Statutes § 80C.04, which prescribes the content of a UFOC (in the statute's terms, a franchisor's "public offering statement"). First Am. Compl. ¶ 261, 269.d. Under subdivision 1(p) of § 80C.04, a UFOC must include "a copy of any statement of estimated or projected franchisee earnings prepared for presentation to prospective franchisees or subfranchisors, or other persons, together with a statement setting forth the data upon which such estimation or projection is based...."

Filing an incomplete or misleading UFOC is not, however, directly prohibited by § 80C.04. Rather, it is another part of the statute— § 80C.13 (aptly entitled "Prohibited Practices")—that forbids franchisors to

make or cause to be made any untrue statement of a material fact in any application, notice, report, or other document filed with the commissioner under sections 80C.01 to 80C.22, or omit to state in any such application, notice, report or other document any material fact which is required to be stated therein....

§ 80C.13 subd. 1. The Court will therefore analyze plaintiffs' allegation that Lady of America violated the Minnesota Franchise Act by making earnings claims outside of the UFOC in terms of subdivision 1 of § 80C.13, rather than in terms of § 80C.04.

In sum, plaintiffs' potentially viable contentions about earnings claims relate to violations of two subdivisions of a statute

---

**7.** Subdivision 1 of § 80C.17 of the Minnesota Franchise Act provides: "A person who violates any provision of this chapter or any rule or order thereunder shall be liable to the franchisee or subfranchisor who may sue for damages caused thereby, for rescission, or other relief as the court may deem appropriate." Minn.Stat. § 80C.17 subd. 1.

(subdivisions 1 and 2 of § 80C.13) and to violations of one rule (Rule 2860.4500):

(1) If Lady of America made earnings claims that were themselves false, those false earning claims may have violated subdivision 2 of § 80C.13.

(2) If Lady of America made any earnings claims—true or false—the assertion in the UFOC that Lady of America does not furnish information about prospective franchisees' sales or profits was false, and that false assertion may have violated subdivisions 1 and 2 of § 80C.13 and Rule 2860.4500(A).

(3) If Lady of America made any earnings claims—again, true or false—that were not included in the UFOC, it may have violated subdivision 1 of § 80C.13 by "omit[ting] to state in [the UFOC a] material fact which is required [under § 80C.04 subd. 1(p)] to be stated therein." Moreover, Lady of America may have violated Rule 2860.4500(2) by making earnings claims (true or false) if it did not adequately disclose the additional, related information called for in that rule.

### b. Lady of America's Defenses

In defending against plaintiffs' claims, Lady of America relies most heavily on the franchise agreement's integration clause and the various disclaimers included in the UFOC and the franchise agreement. Lady of America argues that, in light of these provisions, it is entitled to summary judgment for various reasons. The Court disagrees.

### i. Parol Evidence

■ Lady of America first argues that, under the parol-evidence rule, plaintiffs may not introduce any evidence of earnings claims made by Lady of America. Def. Mem. Supp. Mot. S.J. at 22 [Docket No. 78] ("Def.S.J.Mem."). As an initial matter, the Court doubts whether the parol-evidence applies to claims made under the Minnesota Franchise Act. The parol-evidence rule is a doctrine of contract law; it holds parties to the written, substantive terms of their bargain when they have executed an integrated agreement. *See Taylor v. More,* 195 Minn. 448, 263 N.W. 537, 539 (1935) ("[P]arol evidence cannot be admitted to add another term to the agreement.... The rule forbids to add by parol where the writing is silent, as well as to vary where it speaks.") (internal quotations omitted); *United Artists Commc'ns, Inc. v. Corporate Prop. Investors,* 410 N.W.2d 39, 42–43 (Minn.Ct.App.1987) (citing *Taylor*). But the Minnesota Franchise Act creates a statutory cause of action, not a contract claim. Further, in making claims under the Minnesota Franchise Act, the franchisee generally does not seek to change the terms of a written contract, but to avoid a contract altogether because of deceptive conduct by the franchisor in inducing the franchisee to enter the contract.

At least one court has stated that the parol-evidence rule, as a contract-law doctrine, does not apply to a claim of negligent-misrepresentation because such a claim "sounds in tort." *Formento v. Encanto Bus. Park,* 154 Ariz. 495, 744 P.2d 22, 26 (Ariz.App.1987). Other courts have held that the parol-evidence rule cannot be used to defeat negligent-misrepresentation claims unless those claims are brought by plaintiffs to skirt the parol-evidence rule and enforce purported extra-contractual promises. *See Rio Grande Jewelers Supply, Inc. v. Data Gen. Corp.,* 101 N.M. 798, 689 P.2d 1269, 1271 (1984) (characterizing negligent-misrepresentation claim as "nothing more than an attempt to circumvent the operation of the Commercial Code and to allow the contract to be rewritten under the guise of an alleged action in tort"); *Snyder v. Lovercheck,* 992 P.2d 1079, 1088 (Wyo.1999) (holding that the parol-evidence rule applies in negligent-misrepresentation cases because in those cases, "a tort cause of action is being in-

fused into a contractual relationship"). And even courts that generally apply the parol-evidence rule in negligent-misrepresentation cases may decline to do so in fraud cases. *See Rio Grande,* 689 P.2d at 1271 (noting, in holding that a contractual disclaimer defeated a negligent-misrepresentation claim, that "fraud was not argued"); *Snyder,* 992 P.2d at 1086 (holding that merger and disclaimer clauses do not preclude the plaintiff from asserting a fraudulent-misrepresentation claim).

In Minnesota, the parol-evidence rule has a narrow scope in fraud cases. In *Ganley Brothers, Inc. v. Butler Brothers Building Co.,* one of the earliest Minnesota Supreme Court cases on this issue, the court observed: "The law should not and does not permit a covenant of immunity to be drawn that will protect a person against his own fraud." 170 Minn. 373, 212 N.W. 602, 603 (1927). The Minnesota Supreme Court was well aware of the policy implications of its holding. It specifically recognized that enforceable contractual disclaimers "may be desirable in dealing with unscrupulous persons ... as a shield against wrongful charges of fraud." *Id.* Ultimately, however, it rejected the argument that contractual disclaimers should be permitted to defeat fraud claims, noting: "We are unable to formulate a rule of law sustaining defendant's contention [i.e., that a fraud claim should fail in light of a contractual disclaimer of reliance] which would not at the same time give opportunities for the commission of fraud for which the wronged party would have no redress." *Id.* Minnesota courts continue to follow the disclaimer-unfriendly approach outlined in *Ganley Brothers. See, e.g., Hoyt Props. v. Prod. Res. Group, L.L.C.,* 716 N.W.2d 366, 375 (Minn.Ct.App.2006), *review granted,* No. A05-1293, 2006 Minn. LEXIS 588 (Minn. Aug. 23, 2006); *Appletree Square I Ltd. P'ship v. Investmark, Inc.,* 494 N.W.2d 889, 893 (Minn.App.1993).

Minnesota's approach contrasts with that of New York, which has applied the parol-evidence rule broadly in fraud cases ever since the seminal case of *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597, 598–600 (1959). Notably, the dissenting judge in *Danann* disagreed with the majority's conclusion that the disclaimer in that case defeated the plaintiff's fraud claim, and he supported his position by quoting at length from the Minnesota Supreme Court's opinion in *Ganley Brothers. Id.* at 604 (Fuld, J., dissenting). More recently, when the New Hampshire Supreme Court addressed the effect of disclaimers in fraud cases, that court expressly rejected the *Danann* rule. *Van Der Stok v. Van Voorhees,* 151 N.H. 679, 866 A.2d 972, 976 (2005). To support its holding that contractual disclaimers cannot defeat liability in cases of "positive fraud," the New Hampshire Supreme Court in *Van Der Stok* quoted approvingly the portion of the *Danann* dissent that, in turn, quoted *Ganley Brothers.* As *Van Der Stok* illustrates, Minnesota law is a model for other jurisdictions that choose to apply the parol-evidence rule narrowly in fraud cases.

In Minnesota, only when an allegedly fraudulent statement directly contradicts a substantive contract term will courts rely on the parol-evidence rule to reject a fraud claim. The leading Minnesota case exemplifying such an application of the parol-evidence rule is *Vint v. Nelson,* 267 Minn. 490, 127 N.W.2d 177 (1964). *Vint* involved a dispute over a real-estate agent's listing contract. By its terms, the contract was exclusive for six months, then revocable on 30 days' notice. *Id.* at 178. The real-estate agent sued his clients after they sold their property without the agent's assistance within six months after signing the listing contract and refused to pay the agent a commission. In defense, the clients argued that the agent had commit-

ted fraud by lying about the contract's terms and telling them that it was terminable at any time on 30 days' notice (i.e., that there was no six-month lock-in). *Id.* at 180–81. The court held that the parol-evidence rule was properly applied to exclude the clients' testimony about the agent's statements because "the testimony offered to establish fraud related to matters known to be covered by the written agreement *and* to the claim that plaintiff had represented that contractual provisions having reference thereto would not be effective." *Id.* at 181 (emphasis added).

Under Minnesota parol-evidence law, the direct-contradiction test is narrowly applied, as in *Vint.* In particular, courts generally treat extra-contractual representations and warranties—such as the earnings claims in this case—differently from other types of extra-contractual promises. This distinction inheres in the Minnesota Supreme Court's 1912 decision in *General Electric Co. v. O'Connell,* 118 Minn. 53, 136 N.W. 404 (1912). The plaintiff in *General Electric* bought drills for tunneling through rock after having allegedly been assured by the seller that the drills were adequate for the plaintiff's purposes. *Id.* at 404–05. The drills turned out to be totally inadequate. *Id.* at 405. The contract included no warranty provision, and included a general merger clause that disclaimed any extra-contractual representations. *Id.* at 404. The court held that the parol-evidence rule did not bar evidence of the seller's alleged representations about the quality of the drills in the buyer's fraud suit because the parol-evidence rule

does not apply "where the fraud consists of *representations* regarding the subject-matter of the contract, *aside from its agreements and promises . . . .*" *Id.* at 406 (emphasis added).

More recently, the Minnesota Supreme Court again applied the parol-evidence rule narrowly with respect to representations in *Hanson v. Stoerzinger,* 299 N.W.2d 401 (Minn.1980). Hanson sold Stoerzinger a motel and told him that the motel sat on one-and-a-half acres of land. *Id.* at 402. The actual purchase agreement, however, specified "legal to govern" the property's description, and Stoerzinger's attorney had the abstract of title— from which the property's size could be calculated—in his hands before the closing date. *Id.* at 402, 404. Stoerzinger eventually learned that the motel sat on about a half acre, not one-and-a-half acres, and sued Hanson for misrepresentation. *Id.* at 403. The court held that the parol-evidence rule did not bar testimony about Hanson's description of the property. The court noted that parol evidence "is admissible to determine whether a contract is void or voidable on ground[ ] of fraud," *id.* at 404 n. 4, and observed that the purchase agreement "contains no disclaimer of oral representations regarding the property's physical characteristics," *id.* at 404—as if "legal to govern" meant "legal to govern, unless you were told otherwise." [8]

Not only is the direct-contradiction test applied narrowly, it is subject to at least two significant exceptions. These exceptions are typically discussed in connection with the reliance element of fraud claims,

---

**8.** Courts sometimes discuss the narrow reach of the direct-contradiction test in connection with the reliance element of fraud claims (discussed further in the text). For instance, in *Clements Auto Co. v. Service Bureau Corp.,* after surveying Minnesota law on the effect of disclaimers in fraud cases, the Eighth Circuit observed: "The only situation in which the Minnesota courts have held that a contract

provision negatives a claim of fraud is where the provision explicitly states a fact completely antithetical to the claimed misrepresentations." 444 F.2d 169, 179 (8th Cir.1971); *see also Johnson Bldg. Co. v. River Bluff Dev. Co.,* 374 N.W.2d 187, 194 (Minn.Ct.App.1985) (paraphrasing the quoted passage from *Clements Auto*).

as they are in *General Corporation v. General Motors Corp.*, 184 F.Supp. 231 (D.Minn.1960). In that case, the court held that under Minnesota law, a jury should decide a fraudulent-inducement claim based on a purported misrepresentation that plainly contradicts the contract, provided the misrepresentation is "accompanied by misrepresentations of other material facts in addition to the contradictory intent...." *Id.* at 239; *see also Johnson Bldg. Co. v. River Bluff Dev. Co.*, 374 N.W.2d 187, 194 (Minn.Ct.App.1985) (paraphrasing the quoted passage from *General Corp.*). And in *Weise v. Red Owl Stores, Inc.*, the Minnesota Supreme Court created an exception to the plain-contradiction rule for laypersons, holding:

> [W]here a party makes a representation which a signed document contradicts, the person to whom the representation was made is justified in relying upon it where the document, as here, is couched in ambiguous legal language which a layman could reasonably believe supported the representation.

286 Minn. 199, 175 N.W.2d 184, 187 (1970), *overruled in part on other grounds, Humphrey v. Alpine Air Prods., Inc.*, 500 N.W.2d 788, 791 (Minn.1993).

In light of this case law, the Court finds that the alleged earnings claims in this case do not so directly contradict the franchise agreement that the parol-evidence rule would bar evidence of those earnings claims. To the extent that the earnings claims contradict the franchise agreement, they contradict only its disclaimer clause. This is not the type of contradiction that invokes the parol-evidence rule in Minnesota. Accordingly, even if the parol-evidence rule applies to claims under the Minnesota Franchise Act (which is doubt-

ful), it would not exclude evidence that Lady of America induced plaintiffs to sign franchise agreements by making false earnings claims.

### ii. Justifiable Reliance

■ Lady of America next argues that the Court should find, as a matter of law, that plaintiffs could not have justifiably or reasonably relied on any alleged earnings claims. The justifiable-reliance argument overlaps with, but is distinct from, the parol-evidence argument. The parol-evidence argument is, in essence, this: "The earnings claims contradict the terms of an integrated contract; evidence of them must therefore be excluded." The justifiable-reliance argument, however, is this: "The contractual disclaimers contradict the earnings claims; in the face of such contradiction, no reasonable person could have relied on the earnings claims." The arguments are different and must be treated separately. *See Johnson Bldg. Co.* 374 N.W.2d at 193–95 (treating the parol-evidence rule and justifiable reliance as separate questions); *but see Crowell v. Campbell Soup Co.*, 264 F.3d 756, 762 (8th Cir. 2001) (affirming district court's exclusion, based on the parol-evidence rule, of evidence of oral promises that contradicted an integrated agreement, and basing affirmance on finding that "any reliance ... was unreasonable as a matter of law").

Lady of America bases its justifiable-reliance argument primarily on *Carlock v. Pillsbury Co.*, 719 F.Supp. 791 (D.Minn. 1989). *Carlock* involved a dispute between franchisees and a franchisor, and the franchise agreement and UFOC in *Carlock* included disclaimers like those in this case. *Id.* at 828–29 (quoting disclaimers). The court in *Carlock*, however, did not apply or construe the Minnesota Franchise Act.[9] In-

---

**9.** In fact, the defendant franchisor in *Carlock* did not even move for summary judgment on the Minnesota Franchise Act claims in that case, despite apparently having moved for

summary judgment on every other claim. 719 F.Supp. at 799 n. 2. Perhaps the defendant understood (as this Court concludes)

stead, the court applied New York law to the parties' contract claims, *id.* at 811, and non-state-specific common law to the parties' fraud claims, *id.* at 826–27. To support its conclusion that the *Carlock* franchisees could not reasonably have relied on any representations by the franchisor, the court relied mainly on securities-fraud cases from other circuits. *Id.* at 829 (citing, *inter alia, Jackvony v. RIHT Fin. Corp.,* 873 F.2d 411, 416 (1st Cir.1989); *Kennedy v. Josephthal & Co.,* 814 F.2d 798, 805 (1st Cir.1987); *Zobrist v. Coal–X, Inc.,* 708 F.2d 1511, 1518 (10th Cir.1983)). *Carlock* is thus of limited use in this case.

The Court finds that, under Minnesota law, Lady of America's justifiable-reliance argument does not support summary judgment in its favor. Just as Minnesota applies the parol-evidence rule narrowly in cases involving disclaimers, so too does Minnesota give disclaimers limited effect in defeating the reliance element of fraud claims. *General* disclaimers and integration clauses are given no effect in misrepresentation cases under Minnesota law. As the Eighth Circuit explained after carefully reviewing Minnesota case law in *Clements Auto Co. v. Service Bureau Corp.,* in Minnesota "a general disclaimer clause is ineffective to negate reliance on even innocent misrepresentations." 444 F.2d 169, 178 (8th Cir.1971). And even fairly *specific* disclaimers are typically

held to create jury questions about reliance, rather than to negate reliance as a matter of law.[10] Moreover, reliance under Minnesota law is necessarily fact-specific, because it must be assessed from the subjective perspective of the person allegedly defrauded, not from some objective viewpoint. *See Berg v. Xerxes–Southdale Office Bldg. Co.,* 290 N.W.2d 612, 616 (Minn. 1980). For these reasons alone, Lady of America is not entitled to summary judgment on the basis of its justifiable-reliance argument.

Further, the Court is not convinced that justifiable or reasonable reliance is an element of a claim for misrepresentation under the Minnesota Franchise Act. Subdivision 2 of § 80C.13 forbids a franchisor to sell (or offer to sell) a franchise "by means of any written or oral communication which includes an untrue statement of a material fact."[11] Nowhere does the statute mention justifiable reliance. Of course, *some kind* of reliance—reasonable or unreasonable—is required, because a franchisee can only recover for damages that are *caused* by a franchisor's violation of the Minnesota Franchise Act. *See* Minn. Stat. § 80C.17. Without reliance, there can be no causation. But a franchisee could, as a factual matter, suffer damages as a result of *unreasonably* relying on a franchisor's misrepresentation.

that Minnesota Franchise Act claims cannot be defeated by disclaimers.

**10.** *See, e.g., Commercial Prop. Invs., Inc. v. Quality Inns Int'l, Inc.,* 938 F.2d 870, 875–77 (8th Cir.1991) (reversing grant of summary judgment where district court erroneously found that contractual disclaimers negated reliance); *Gen. Corp.,* 184 F.Supp. at 239; *Weise,* 286 Minn. at 203–04, 175 N.W.2d 184; *Veit v. Anderson,* 428 N.W.2d 429, 433 (Minn. Ct.App.1988) ("Since the language of the agreement does not squarely contradict Anderson's alleged oral representations, the issue of whether Veit reasonably relied on the

representations is an issue of fact."); *St. Croix Printing Equip. v. Rockwell Int'l Corp.,* 428 N.W.2d 877, 878, 882 (Minn.Ct.App.1988) (despite "as is" clause in contract for sale of printing equipment, finding that a jury question exists as to whether buyer reasonably relied on seller's representations about the equipment's capabilities); *Johnson Bldg. Co.,* 374 N.W.2d at 194–95.

**11.** Subdivision 2 of § 80C.13 also prohibits misleading omissions by franchisors. For the sake of simplifying the Court's exposition of the legal principles, the Court will focus on misrepresentations rather than omissions.

True, a number of federal courts have interpreted other states' franchise statutes to implicitly require the franchisee to demonstrate reliance that is justifiable or reasonable. *See Cook v. Little Caesar Enters., Inc.*, 210 F.3d 653, 659 (6th Cir.2000) (holding that reasonable reliance is an element of a misrepresentation claim under Michigan's franchise law); *Hardee's of Maumelle, Ark., Inc. v. Hardee's Food Sys., Inc.*, 31 F.3d 573, 579 (7th Cir.1994) (observing that lower Indiana courts have read a reasonable-reliance requirement into Indiana's franchise law, but not reaching question); *Bonfield v. AAMCO Transmissions, Inc.*, 708 F.Supp. 867, 876–78 (N.D.Ill.1989) (reading reasonable-reliance requirement into Illinois's franchise law) (superseded by statute on other grounds, as explained in *Lewis v. Hermann*, 775 F.Supp. 1137, 1153 (N.D.Ill.1991)). But no Minnesota court has read such a requirement into the Minnesota Franchise Act's prohibition on misrepresentations by franchisors.

This is not surprising. Minnesota courts have repeatedly observed that the Minnesota Franchise Act is a remedial statute designed to favor franchisees over franchisors. *See, e.g., Clapp v. Peterson*, 327 N.W.2d 585, 586 (Minn.1982) (observing that the Minnesota Franchise Act "was adopted in 1973 as remedial legislation designed to protect potential franchisees within Minnesota from unfair contracts and other prevalent and previously unregulated abuses in a growing national franchise industry"); *Martin Investors, Inc. v. Vander Bie*, 269 N.W.2d 868, 872 (Minn. 1978) (same); *Pac. Equip. & Irrigation, Inc. v. Toro Co.*, 519 N.W.2d 911, 917 (Minn.Ct.App.1994) ("[I]f the franchise act applies, the consideration of public policy would favor Pacific, since Pacific would be entitled to special protection under the law as a franchisee."); *id.* at 919–20 (Amundson, J., concurring) ("The Minnesota Franchise Act is an attempt to protect the

franchisee from undue usurpation of the franchise relationship and to establish balance of bargaining power.... Thus, I believe the Minnesota Franchise Act should be broadly construed...."). This principle would obviously support allowing recovery under the Minnesota Franchise Act by franchisees who suffer harm after relying, even unreasonably, on misrepresentations by franchisors.

Further, in *Noble v. C.E.D.O., Inc.*, the Minnesota Court of Appeals declined to read a scienter requirement into § 80C.13's prohibition on misrepresentation. 374 N.W.2d 734, 741 (Minn.Ct.App. 1985). In doing so, the court focused on the "plain meaning" of the statute. *Id.* This plain-meaning approach, if applied to the question whether to read a requirement of justifiable reliance into § 80C.13, would lead to the conclusion that justifiable reliance—like scienter—is *not* an element of a claim under the statute. As noted, nowhere does the statute require that any reliance on a misrepresentation be justifiable or reasonable. If, as the Court suspects, the Minnesota Franchise Act does not require that a franchisee's reliance on misrepresentations be justifiable, then it is irrelevant whether the plaintiffs' reliance on the earnings claims made by Lady of America was reasonable in light of the disclaimers in the UFOC and the franchise agreement. Lady of America is plainly not entitled to summary judgment on the basis of its justifiable-reliance argument.

### iii. Anti–Waiver Provision of Minnesota Franchise Act

■ Plaintiffs also argue that Lady of America is not entitled to summary judgment on the basis of the disclaimers in the UFOC and franchise agreement because those disclaimers are void under § 80C.21 of the Minnesota Franchise Act. Section 80C.21 provides:

Any condition, stipulation or provision, including any choice of law provision, purporting to bind any [covered franchisee] to waive compliance or which has the effect of waiving compliance with any provision of sections 80C.01 to 80C.22 or any rule or order thereunder is void.

Minn.Stat. § 80C.21. The question, then, is whether the provisions on which Lady of America relies would effect the type of waiver prohibited by § 80C.21.

There is little case law on the scope of § 80C.21. It is clear, though, that the Minnesota legislature intended it to apply broadly. The original version of the statute, passed in 1973, did not explicitly refer to choice-of-law clauses. This led the Eighth Circuit to conclude that courts should give effect to a choice-of-law clause in a franchise agreement that designated non-Minnesota law, even though the clause rendered the protections of the Minnesota Franchise Act inapplicable. *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 738–40 (8th Cir.1989). The Minnesota legislature responded by amending § 80C.21 to explicitly cover choice-of-law clauses. 1989 Minn. Sess. Laws. Serv. ch. 198 § 2 (West) (May 19, 1989); *see also Commercial Prop. Invs., Inc. v. Quality Inns Int'l, Inc.*, 938 F.2d 870, 874 (discussing history of § 80C.21). The legislature said that it was clarifying § 80C.21, not expanding it. 1989 Minn. Sess. Law Serv. ch. 198 § 3 (West) (May 19, 1989). In other words, the legislature said that it had intended the 1973 version of the Act to cover choice-of-law clauses, even though they were not explicitly mentioned in the Act. This indicates that § 80C.21 is to be construed broadly, as does the fact that Minnesota courts have recognized repeatedly that the Minnesota Franchise Act is a remedial statute designed to favor franchisees.

The plain language of § 80C.21 is consistent with the broad scope intended by the legislature and advocated by plaintiffs. Section 80C.21 voids anything in a contract that explicitly waives compliance with a provision of the Act or that has the *effect* of waiving compliance with a provision of the Act. One such provision that cannot be waived is § 80C.13's prohibition of material false statements.

Section 80C.13's scope is clear. The provision would, for example, prohibit a dishonest franchisor from telling a franchisee that all existing franchise locations had gross annual sales of at least $1 million, when in fact no location had gross sales over $250,000. And it is equally clear that, under § 80C.21, the dishonest franchisor could not avoid § 80C.13's prohibition by including the following in the franchise agreement: "I may have misrepresented the revenues of existing franchises. You waive your right to hold me liable for those misrepresentations under § 80C.13 of the Minnesota Franchise Act." Such a provision would plainly be invalid under § 80C.21.

Under § 80C.21, any provision that has the same "effect" as this waiver would also be invalid. Suppose, for example, that the dishonest franchisor included in the franchise agreement not the express waiver provision quoted in the preceding paragraph, but rather the following: "I did not make any representations about the revenues of existing franchises. If you disagree, I hereby disclaim any representations that you believe I made. You cannot rely on them." Why should such a disclaimer, for purposes of Minnesota's franchise law, be treated any differently from the express waiver? The disclaimer cannot change the historical facts; if the dishonest franchisor made misrepresentations, then he made misrepresentations, no matter what the franchise agreement says.

Thus, the disclaimer can only be an attempt to change the *legal effect* of those misrepresentations. That is precisely what § 80C.21's anti-waiver language forbids.

Similarly, suppose that the dishonest franchisor included the following in the franchise agreement: "I did not make any representations about the revenues of existing franchises. If you disagree, you must list such representations below. If you don't list a representation, you cannot later sue me for making that representation." Again, the disclaimer cannot change the historical facts of what representations were made. Rather, the disclaimer is attempting to change the *legal effect* of those representations. Instead of telling the franchisee, "You waive your right to sue me for any misrepresentation when you sign this agreement," the franchisor tells the franchisee, "You waive your right to sue me for certain misrepresentations—those you fail to list before signing this agreement." Such an assertion has "the effect of waiving compliance with" § 80C.13's prohibition of material false statements, and thus it is void under § 80C.21.

The Court recognizes that, under its broad interpretation of § 80C.21, franchisors cannot use contractual provisions to protect themselves from being sued for misrepresentation under the Minnesota Franchise Act. Consequently, even scrupulously honest franchisors will have to defend against some misrepresentation claims that would not be brought—or that would be quickly dismissed—if contractual disclaimers were enforceable. But under the interpretation of § 80C.21 advocated

by Lady of America—that is, under a rule in which courts give effect to contractual disclaimers regardless of whether franchisors have actually made false statements of material facts—a certain number of franchisees who have been lied to will have no redress against dishonest franchisors. The Minnesota legislature has decided to burden franchisors, and protect franchisees, and this Court is bound to enforce that decision.[12]

### iv. Future Projections

■ Lady of America has raised one additional defense to plaintiffs' earnings-claims-based allegations: Citing only *Morrison v. Back Yard Burgers, Inc.*, a 1996 Eighth Circuit case, Lady of America argues that "representations as to future franchise profitability, earnings, support or performance cannot provide a basis for an action in fraud." Pl. S.J. Mem. at 23 (citing *Morrison*, 91 F.3d 1184, 1186 (8th Cir.1996)). *Morrison* held that a franchisor could not be liable for fraud based on profit projections because the franchisor "could not have known that his projections" would end up being false. *Morrison*, 91 F.3d at 1187. But *Morrison* involved a common-law fraud claim under Arkansas law, not a claim under the Minnesota Franchise Act. And even as to common-law fraud, *Morrison* does not accurately reflect the rule in Minnesota.[13]

In *Berg v. Xerxes–Southdale Office Building Co.*, the Minnesota Supreme Court held that whether "[p]rojections . . . [are] actionable or not in fraud . . . depend[s] upon whether they accurately reflect surrounding past and present circumstances." 290 N.W.2d 612, 615 (Minn. 1980). The plaintiffs in *Berg* had been

---

**12.** The Court notes that the South Dakota legislature has similarly decided to foreclose franchisors from using disclaimers to defeat franchisees' claims under South Dakota's franchise law. *See* S.D. Codified Laws § 37–5A–86 (2007).

**13.** *Morrison* also does not reflect reality. If, for example, a franchisor of hot-dog stands tells a franchisee that he will earn $1 billion per year selling hot dogs on a street corner, the franchisor most certainly can know that its projections will end up being wrong.

persuaded to invest in a commercial building based on a set of rosy projections of the building's cash flow for 1972. The defendant had withheld the actual (negative) cash-flow results from 1971. *Id.* at 614–15. The trial court held that the plaintiffs' fraud claim failed as a matter of law because predictions of future results, such as cash-flow projections, could not support a fraud claim. *Id.* at 615. The Minnesota Supreme Court disagreed and remanded for a jury trial on whether the investors had reasonably relied on the projections. *Id.* at 615–16.

Given that projections can, in some circumstances, support a common-law fraud claim, the Court sees no reason why projections cannot also support a claim for misrepresentation under the Minnesota Franchise Act. The Minnesota Supreme Court has explained that the state's consumer-protection statutes are "clearly intended to make it easier to sue for consumer fraud than it had been to sue for fraud at common law." *Humphrey v. Alpine Air Prods., Inc.,* 500 N.W.2d 788, 790 (Minn.1993). Although the court was referring to Minnesota's Unfair and Deceptive Trade Practices Act and Consumer Fraud Act, and not to the Minnesota Franchise Act, there is no reason to believe that the court's assertion does not apply to the latter. *See, e.g., Clapp v. Peterson,* 327 N.W.2d 585, 586 (Minn.1982) (describing the Minnesota Franchise Act as "remedial legislation").

In sum, the Court finds that if Lady of America made assurances to franchisees about their expected membership numbers, revenues, and profitability—and if those assurances did not "accurately re-flect surrounding past and present circumstances," *Berg,* 290 N.W.2d at 615—then those assurances could subject Lady of America to liability under the Minnesota Franchise Act. Accordingly, the Court denies summary judgment on plaintiffs' Minnesota Franchise Act claims to the extent they are based on alleged misrepresentations about earnings.

### 2. Vendor Rebates

Plaintiffs also seek to hold Lady of America liable under the Minnesota Franchise Act for failing to disclose that it received rebates from vendors who sold products to franchisees. Lady of America argues that it is entitled to summary judgment on this claim because plaintiffs have provided no admissible evidence that it received such rebates. Def. S.J. Mem. at 21. The Court agrees.

Plaintiffs make only one concrete allegation about rebates: Deborah Randall's landlord purportedly told her that he paid a $10,000 kickback to Lady of America after Randall signed her lease agreement. Pl. S.J. Opp. at 31; Randall Aff. ¶ 23. But Randall's statement about her landlord's statement is hearsay. Inadmissible hearsay cannot defeat a motion for summary judgment. *See Brooks v. Tri–Systems, Inc.,* 425 F.3d 1109, 1111 (8th Cir.2005) (hearsay statement contained in an affidavit may not be used to support or defeat a summary-judgment motion); *Henthorn v. Capitol Commc'ns, Inc.,* 359 F.3d 1021, 1026 (8th Cir.2004) (only admissible evidence can defeat a summary-judgment motion). The Court therefore grants summary judgment to Lady of America on plaintiffs' rebate-related claims under the Minnesota Franchise Act.[14]

---

**14.** The Court notes, however, that it doubts whether Lady of America could succeed on its argument that it "fully disclosed vendor rebates" in the UFOC. Pl. Mem. Supp. Mot. S.J. at 20. The UFOC simply includes a blanket statement that Lady of America might get unspecified rebates from unspecified vendors. Such a blanket statement is almost surely insufficient under federal and state franchise laws, which require detailed disclosures by franchisors about vendor rebates.

### 3. Interest of Other Franchisees

■ Plaintiffs allege that Lady of America violated Minnesota Rule 2860.4300 by telling them that they needed to act quickly because others were pursuing the limited number of Minnesota franchises. First Am. Compl. ¶¶ 264, 269.g. In relevant part, Rule 2860.4300 provides:

> No person may make or cause to be made any statement or representation that ... other individuals are willing to enter into a franchise agreement substantially similar to that being offered, granted, or sold without, at the same time, disclosing in writing the source of such information and the names, addresses, and telephone numbers of such individuals....

Minn. Rule 2860.4300, subp. 2.

Neither Lady of America nor plaintiffs put much effort into briefing this obviously peripheral claim. Lady of America does argue that the merger clause and disclaimers in the franchise agreement should defeat this claim. For the reasons given above in connection with the earnings claims, the Court finds that the franchise agreement's merger clause and disclaimers do not defeat plaintiffs' claims under Rule 2860.4300. Lady of America also argues that, even if it made representations to plaintiffs about the interest of third parties, there is no evidence that those representations were false. Def. S.J. Mem. at 21. This argument fails for two reasons:

First, plaintiffs have presented evidence, in the form of affidavits from Robin Allanson and Michelle Evans, that Lady of America representative Elliot Melement did in fact lie to Evans about Allanson's interest in a location in Blaine, Minnesota. Evans Aff. ¶ 14; Allanson Aff. ¶ 3. Second, and more importantly, Rule 2860.4300 does not forbid *false* claims about third-party

interest. (Those are already forbidden by Minn.Stat. § 80C.13.) Rather, the rule forbids making *any* claims about third-party interest—true or false—without "disclosing in writing the source of such information [i.e., information about interested third-parties] and the names, addresses, and telephone numbers of" the interested third parties. The rule is concerned about disclosure, not accuracy. Lady of America does not contend that it made the disclosures required by Rule 2860.4300, and therefore Lady of America is not entitled to summary judgment on plaintiffs' claims.

### C. *Florida Franchise Act (Plaintiffs' Count II)*

■ Plaintiffs allege in Count II of their complaint that Lady of America violated the Florida Franchise Act. First Am. Compl. ¶¶ 281.a-.b. As relevant to this case, the Florida Franchise Act forbids a franchisor to do two things:

> 1. Intentionally to misrepresent the prospects or chances for success of a proposed or existing franchise or distributorship; [and]
>
> 2. Intentionally to misrepresent, by failure to disclose or otherwise, the known required total investment for such franchise or distributorship....

Fla. Stat. Ann. § 817.416(2)(a)(1)-(2). The statute provides franchisees with a single remedy: "judgment for all moneys invested" in a franchise that was sold in violation of the statute, plus costs and (at the court's discretion) attorney's fees. *Id.* § 817.416(3).

Lady of America argues that plaintiffs' claims under the Florida Franchise Act, whatever their merits, are time-barred in light of the two-year contractual limitations period in the franchise agreement. Pl. S.J. Mem. at 25–26. Section 10.5 of the franchise agreement provides: [15]

---

**15.** The quoted portion of Section 10.5 is in all capital letters in the franchise agreement, but is reproduced here in upper and lower case for the sake of legibility.

The franchisee will file suit against the franchisor within 2 years of the first occurrence of any breach of contract or tortious act of the franchisor including fraud, misrepresentation, *statutory torts*, negligence, promissory estoppel and *all actions however denominated* or is deemed to have waived the same and any objection to all future similar occurrences.

Wright Aff. Ex. 1 at MIN0001529 (emphasis added). By its terms, this provision would—if it is legally effective—reach plaintiffs' claims under the Florida Franchise Act.[16]

Plaintiffs argue that the Court should disregard the two-year limitations provision in the franchise agreement because that provision is void under Florida law. Section 95.03 of the Florida statutes provides: "Any provision in a contract fixing the period of time within which an action *arising out of the contract* may be begun at a time less than that provided by the applicable statute of limitations is void." Fla. Stat. Ann. § 95.03 (emphasis added). Whether plaintiffs are correct thus depends on whether their claims under the Florida Franchise Act "aris[e] out of the contract" for purposes of § 95.03.

Lady of America relies primarily on *Lady of America Franchise Corp. v. Strainer*, No. 06–60163–CIV, slip op. (S.D. Fla. June 5, 2006). Def. S.J. Mem. at 26–27. *Strainer* held that claims made by franchisees under Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") did not arise out of a contract for purposes of § 95.03. *Strainer*, slip op. at 3–6. *Strainer* said nothing about whether claims made by franchisees under the Florida Franchise Act arise out of a contract for purposes of § 95.03. But the reasoning of *Strainer*—and of the Florida cases cited in *Strainer*—actually *undermines* Lady of America's argument that plaintiffs' claims under the Florida Franchise Act do not arise out of a contract (the contract being the franchise agreement).

*Strainer* observed that the plaintiffs in that case could have brought their claims under FDUTPA "regardless of whether they entered into the Franchise Agreement" with Lady of America. *Id.*, slip op. at 5. Because the *Strainer* plaintiffs' FDUTPA claim could have been brought even if the plaintiffs had never signed a contract, the court found that the FDUTPA claim was not "inextricably intertwined with the contract" and therefore did not arise out of the contract for purposes of § 95.03. *Id.*

In reaching this conclusion, *Strainer* relied on *Caufield v. Cantele*, 837 So.2d 371 (Fla.2002). In *Caufield*, the Florida Supreme Court interpreted a contractual provision that gave the prevailing party the right to recover attorney's fees in litigation "arising out of" the contract. *Caufield* concluded that a claim of fraudulent misrepresentation "arose out of" the contract because the claim could not have been brought in the absence of the contract. As the court explained:

> Had there been no contract, the ensuing misrepresentation would not have occurred. Therefore, the existence of the contract and the subsequent misrepresentation in this case are inextricably intertwined such that the tort complained of necessarily arose out of the underlying contract.

*Id.* at 379.

Because *Caufield* interpreted a contractual provision, not § 95.03, *Caufield* does

---

**16.** As noted above, there is no evidence that plaintiff Deborah Randall signed a franchise agreement. Randall's claims under the Florida Franchise Act are therefore not barred by the franchise agreement's limitations provision, regardless of that provision's validity under Florida law.

not establish with certainty what types of actions arise out of a contract for purposes of § 95.03. But *Caufield's* approach is sensible, and it has been endorsed by the United States District Court for the Southern District of Florida in *Strainer.* The Court therefore finds that a non-contract claim "aris[es] out of [a] contract" for purposes of § 95.03 when that non-contract claim could *only* arise if the parties have entered into a contract.

■ The Florida Franchise Act entitles only actual franchisees, not potential franchisees, to relief. Section 817.416(3) allows plaintiffs to recover "all moneys invested in such franchise" if the franchise is sold in violation of § 817.416(2). Recovery of "moneys invested" presupposes that moneys *were* invested—and that, in turn, presupposes that a franchise relationship existed between the plaintiff and the franchisor. Because recovery under the Florida Franchise Act presupposes that the parties have entered into a franchise relationship, actions under the Act necessarily "aris[e] out of the contract" governing that relationship, and therefore Lady of America's attempt to shorten the limitations period that applies to such actions is void under § 95.03.[17]

■ Addressing the merits of plaintiffs' claims under the Florida Franchise Act,

Lady of America makes two arguments. First, as to plaintiff Evans, Lady of America asserts that Evans has no Florida Franchise Act claims because she purchased her franchise from an existing franchisee, not Lady of America. Def. S.J. Mem. at 27. But Evans paid Lady of America a $12,500 franchise fee and a $5,000 transfer fee, and she executed a franchise agreement. Evans Aff. ¶¶ 18–21. The Florida Franchise Act prohibits misrepresentations by franchisors in connection with "selling *or establishing* " a franchise. Fla. Stat. Ann. § 817.416(2) (emphasis added). In light of the degree and kind of interaction between Evans and Lady of America—not only did Evans pay Lady of America $17,500, but she also talked to Lady of America representatives extensively before purchasing her franchise (Evans Aff. ¶¶ 6–14)—the Court finds that Evans comes within the protection of the Florida Franchise Act.[18]

■ As to the remaining plaintiffs, Lady of America argues that, in light of the integration and disclaimer clauses in the franchise agreement and the UFOC's disclosure about the amount prospective franchisees could expect to invest,[19] plaintiffs cannot have reasonably relied on any representations made outside of the UFOC by Lady of America. Def. S.J. Mem. at 27–

---

**17.** As perhaps demonstrated by Deborah Randall's situation, it may be possible for a franchisor-franchisee relationship to be created even if the parties do not execute a franchise agreement. Such a franchisor-franchisee relationship is nonetheless contractual, and Florida Franchise Act claims based on such a relationship would arise out of the parties' contract. In the absence of a signed franchise agreement, the terms of the parties' contract would be a question of fact.

**18.** In so holding, the Court respectfully declines to follow *Schubot v. McDonalds Corp.,* in which the United States District Court for the Southern District of Florida held that § 817.416(2) did not apply in a suit by a

franchisee against a franchisor where the franchisee had bought the franchise from a third party. 757 F.Supp. 1351, 1357–58 (S.D.Fla.1990). *Schubot* did not discuss whether the franchisee, in the course of purchasing the franchise from a third party, had interactions with the franchisor of any kind, let alone interactions as significant as Evans's interactions with Lady of America.

**19.** Item 7 of the UFOC, entitled "Initial Investment," provides that initial investment costs for a club of the size opened by plaintiffs would range from $18,500 to $60,300. (This amount includes the $12,500 franchise fee.) Wright Aff. Ex. 1 at MIN0001456–58.

28. In response, plaintiffs initially appeal to the law-of-the-case doctrine, arguing that an order [Docket No. 36] issued on October 21, 2005 by the Honorable John R. Tunheim—the judge who presided over this case before it was transferred to the undersigned—dispensed with this argument and the Court should not revisit it. Pl. S.J. Opp. at 36–37. The law-of-the-case doctrine is discretionary, however, and courts will reexamine matters already decided if "there has been an intervening change of law outside the confines of the particular case." 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4478 (2002).

Some months after Judge Tunheim ruled on Lady of America's motion to dismiss, the United States District Court for the Southern District of Florida—in the case of *Lady of America Franchise Corp. v. Malone,* No. 0:05–CV–61304, slip op. (June 5, 2006)—addressed the effect of the disclaimer and integration clauses in Lady of America's franchise agreement on a franchisee's claim under the Florida Franchise Act. *Malone* cannot establish Florida law, of course, but this Court must nevertheless give careful consideration to the views of a federal court sitting in Florida on matters of Florida law.

*Malone* rejected a franchisee's claims against Lady of America under the Florida Franchise Act because the court found that, in light the franchise agreement's integration and disclaimer clauses, the franchisee could not have justifiably relied on any alleged misrepresentations. *Malone,* slip op. at 12–13. This Court is not certain that justifiable reliance is, in fact, an element of a misrepresentation claim under the Florida Franchise Act. The court in *Malone* assumed that it was, based on *Travelodge International, Inc. v. Eastern Inns, Inc.,* 382 So.2d 789 (Fla. App.1980). *Malone,* slip op. at 8–9. But

Travelodge describes the elements of a misrepresentation claim under the Florida Franchise Act as follows:

> We hold that recovery under the statute [i.e., § 817.416(2)(a) ] may be had upon proof of intentional words or conduct by the franchisor, concerning the prospects or chances of success of the enterprise, which *were relied upon* by the franchisee to his detriment, and which are not in accordance with the facts.

382 So.2d at 791 (emphasis added). *Travelodge* requires reliance, but nowhere does it state that the reliance must be justifiable. Plaintiffs, however, do not seem to dispute Lady of America's contention that they must prove reasonable reliance to recover under the Florida Franchise Act. Pl. S.J. Opp. at 37–38. In light of this concession, and in light of *Malone,* the Court will assume that reasonable reliance is an element of a misrepresentation claim under the Florida Franchise Act.

*Malone* found that the franchisee's reliance on any representation made by Lady of America was *not* justifiable in light of the integration and disclaimer clauses in the Lady of America franchise agreement. *Malone,* slip op. at 12–13. In reaching this conclusion, *Malone* distinguished the very Florida cases that Judge Tunheim relied on in his October 21, 2005 order. Judge Tunheim held that, under Florida law, a boilerplate integration clause does not foreclose a plaintiff from introducing extra-contractual statements to demonstrate that he was fraudulently induced to enter into a contract. Docket No. 36 at 8–9 (citing *Mejia v. Jurich,* 781 So.2d 1175, 1178 (Fla.Dist.Ct.App.2001), and *Meter-Logic, Inc. v. Copier Solutions, Inc.,* 126 F.Supp.2d 1346, 1362–63 (S.D.Fla.2000)). But, as *Malone* pointed out, the Lady of America franchise agreement contains not only a boilerplate integration clause, but also a disclaimer clause. *See Malone,* slip

op. at 8–9, 12. Based on cases from federal and state courts in Florida, *Malone* held that the disclaimer clause in the Lady of America franchise agreement was sufficiently specific to defeat the franchisee's claimed reliance on representations about earnings. *See id.* at 10–13 (citing *Hall v. Burger King Corp.*, 912 F.Supp. 1509, 1529 (S.D.Fla.1995), and *Advanced Marketing Sys. Corp. v. ZK Yacht Sales*, 830 So.2d 924, 928 (Fla.Dist.Ct.App.2002)).

Plaintiffs attempt to distinguish *Malone* from this case in only one respect: They assert that the misrepresentations alleged in this case are more wide-ranging than those alleged in *Malone.* Pl. S.J. Opp. at 37–38. In particular, plaintiffs point to allegations that Lady of America misrepresented its advertising plans. *Id.* But even if Lady of America did misrepresent its advertising plans, that misrepresentation is insufficient to distinguish this case from *Malone.* Misrepresentations about advertising plans would be relevant to a claim under § 817.416(2)(a)(1) only to the extent that they related to the "prospects or chances for success" of a franchisee. And the disclaimer clause in the franchise agreement disclaims all representations related to the success of the franchise, as well as all representations related to offers of assistance (such as advertising) by Lady of America. Section 12.2 of the franchise agreement provides: [20]

> [Lady of America] expressly disclaims the making of, and the franchisee acknowledges that he or she has not received, any promises or representations, express or implied, orally, in writing or otherwise of *assistance,* expenses, benefits, *sales volumes, profits, success or any other matter* except as expressly made in this agreement or the [UFOC].

Wright Aff. Ex. 1 at MIN0001533 (emphasis added).

In addition, § 12.2 of the agreement provides that, "[i]f any promises or representations have been made, the franchisee must list them below." *Id.* The Court is not entirely convinced of the sincerity of this invitation, given that the franchise agreement does not actually provide space for the franchisee to list any representations "below." *Id.* at MIN0001533–34. Nonetheless, in light of *Malone,* the Court finds that a Florida court, in the circumstances of this case, would give effect to the disclaimer clause in the franchise agreement as it relates to claims under the Florida Franchise Act. For that reason, the Court grants summary judgment to Lady of America on the Florida Franchise Act claims of all defendants except Deborah Randall.

■■■ As noted above, there is no evidence in the record that Randall signed a franchise agreement. Lady of America has not cited any cases in which a disclaimer in a UFOC alone—as opposed to disclaimers in a UFOC and a franchise agreement together—was found to render a franchisee's reliance on a franchisor's extra-contractual representations unreasonable as a matter of law. Accordingly, the Court finds that under Florida law, whether Randall reasonably relied on Lady of America's extra-contractual representations about her potential for success and the projected startup costs of her franchise is a question of fact for the jury. The Court thus denies summary judgment as to Randall's Florida Franchise Act claims.

### D. FDUTPA Claims (Plaintiffs' Count III)

■■■ In Count III of their complaint, plaintiffs allege that Lady of America violated Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"). Lady

---

**20.** As noted above, this language is in all capital letters in the franchise agreement.

of America argues, as it does with respect to plaintiffs' claims under the Florida Franchise Act, that the two-year limitations period in the franchise agreement bars plaintiffs' FDUTPA claims. Def. S.J. Mem. at 25–27. None of Randall's claims are barred on this basis, because (as explained above) there is no evidence that she executed a franchise agreement. As to the other plaintiffs, the Court finds that some, but not all, of their FDUTPA claims are barred by operation of the franchise agreement's limitations period.

Plaintiffs argue that their FDUTPA claims "arise out of" the franchise agreement and, therefore, § 95.03 nullifies the two-year limitations period in the franchise agreement. Pl. S.J. Opp. at 38–39. (Section 95.03, it will be recalled, provides that "[a]ny provision in a contract fixing the period of time within which an action *arising out of the contract* may be begun at a time less than that provided by the applicable statute of limitations is void.") To support their argument, plaintiffs rely primarily on the Florida Supreme Court's decision in *Taurus Holdings, Inc. v. U.S. Fidelity and Guaranty Co.*, 913 So.2d 528 (Fla.2005), in which the court broadly construed an insurance-policy exclusion that applied to injuries "arising out of" the use of handguns. Pl. S.J. Opp. at 38. The court held that, in the context of "products-completed operations hazard exclusions" in insurance policies, "arising out of" means " 'originating from,' 'having its origin in,' 'growing out of,' 'flowing from,' 'incident to' or 'having a connection with.' " 913 So.2d at 539 (internal quotations omitted).

If this were an insurance case, and if a franchise agreement were a product, *Taurus Holdings* would compel the Court to agree with plaintiffs that their FDUTPA claims "arise out of" their franchise agreement. But this is not an insurance case, and the franchise agreement is not a prod-

uct. As explained above in connection with plaintiffs' claims under the Florida Franchise Act, the Court agrees with *Strainer* that a claim that can be brought in the absence of a contract does not "arise out of" a contract for purposes of § 95.03. And, as explained in *Strainer*, a claim under FDUTPA can be brought even if a potential franchisee never executes a franchise agreement. *Strainer*, slip op. at 5–6. The Court therefore finds that the two-year limitations period in the Lady of America franchise agreement applies to plaintiffs' FDUTPA claims and is not void under § 95.03.

Plaintiffs further argue, however, that the "discovery rule" saves their FDUTPA claims from being barred by the two-year limitations period. Pl. S.J. Opp. at 39–40. Under the discovery rule, a limitations period (statutory or contractual) does not begin to run until the wronged party reasonably could be expected to discover her injury. *See, e.g., Rose Revocable Trust v. Eppich*, 640 N.W.2d 601, 607 (Minn.2002) (discussing Minnesota's discovery rule as it applies to the statute of limitations for fraud claims). Because Lady of America has provided no authority to the contrary, the Court assumes that the discovery rule applies to FDUTPA claims. The Court agrees with plaintiffs that some, but not all, of their FDUTPA claims are saved by the discovery rule.

Plaintiffs make two types of FDUTPA claims. Plaintiffs first contend that Lady of America violated the Federal Trade Commission's Franchise Rule, 16 C.F.R. § 436.1, which declares it "an unfair or deceptive act or practice within the meaning of section 5 of [the FTC Act] for any franchisor" to fail to make certain required disclosures to franchisees in connection with promoting or selling a franchise. Pl. S.J. Opp. at 41–42. Plaintiffs argue that violations of the Franchise Rule are also violations of FDUTPA, which out-

laws "unfair or deceptive acts or practices in the conduct of any trade or commerce," Fla. Stat. Ann. § 501.204(1), and which specifies that "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission ... relating to [section] 5(a)(1) of the Federal Trade Commission Act," Fla. Stat. Ann. § 501.204(2).

To the extent that plaintiffs' FDUTPA claims are based on Lady of America's alleged violation of the FTC's Franchise Rule, the claims of some plaintiffs are barred by the two-year limitations period in the franchise agreement, and not saved by the discovery rule. The Franchise Rule is violated when a franchisor fails to make required disclosures or makes incomplete disclosures such as the allegedly misleading earnings claims at issue in this case. *See* 16 C.F.R. 436.1(b). If Lady of America violated the Franchise Rule through nondisclosure or misdisclosure, this violation was necessarily apparent to the plaintiffs before they signed their franchise agreements.[21]

This case was filed on July 24, 2004. Accordingly, the Franchise Rule-based FDUTPA claims of plaintiffs who signed franchise agreements before July 24, 2002 are barred by the contractual limitations period. Evans signed her franchise agreement in around March 2003, so her claims are not time-barred. Evans Aff. ¶ 18. The Wrights executed their franchise agreement in August 2002, so their claims are not time-barred. Wright Aff. ¶ 18.

The claims of Neudecker and Hoglund–Ross and Weeks, however, are time-barred, because they all signed their franchise agreements before July 24, 2002. Neudecker Aff. ¶ 10 & Ex. 1 at MIN0001211 (franchise agreement is dated July 15, 2002); Hoglund–Ross Aff. ¶ 17 (franchise agreement was signed in November 2001).

■ Plaintiffs's second set of FDUTPA claims are based not on the Franchise Rule, but on the misrepresentations that underlie their Minnesota and Florida franchise-law claims.[22] As described above, various plaintiffs allege that Lady of America representatives told them they should expect a certain number of members on opening and that they could expect to be profitable within a specific time frame after opening. These predictions could not be proven false until either opening (as to representations about members) or six months after opening (as to representations about profitability).

■ Only one set of plaintiffs, Hoglund–Ross and Weeks, opened a club before July 2002: They opened their Columbia Heights location in February 2002. Hoglund–Ross Aff. ¶ 19. Any claims based on representations about that club's opening-day membership are therefore time-barred. Hoglund–Ross and Weeks's claims based on representations about profitability after six months, however, are not time-barred, because such claims could not have been proven false until August 2002.[23]

---

**21.** Lady of America argues that plaintiffs' FDUTPA claims accrued "as of Discovery Day, or on the date of execution of the franchise agreement at the latest...." Def. S.J. Mem. at 26. The Court agrees with respect to FDUTPA claims based on violations of the FTC Franchise Rule, and the Court is therefore using the execution date of the franchise agreement as the accrual date for such FDUTPA claims.

**22.** To the extent that plaintiffs' FDUTPA claims are based on alleged misrepresentations about vendor rebates, the Court grants summary judgment to Lady of America on those claims for the reasons given above in connection with the Minnesota Franchise Act claims.

**23.** It is unclear to the Court to what extent Hoglund–Ross and Weeks are bringing claims related to their New Brighton club, which is still in operation. In any case, that club did

No other plaintiff's FDUTPA claims based on representations about members and profits are barred by the two-year limitations period, because the other plaintiffs opened their clubs after July 24, 2002. Thus no other representation about members or profits could have proved false more than two years before the complaint in this action was filed.

Lady of America's remaining arguments regarding these claims go to the merits, and those arguments merely create issues of fact that the jury will have to resolve. Lady of America argues, for example, that plaintiffs' damages were caused by their mistakes in running their franchises, not by Lady of America's misrepresentations. Def. S.J. Mem. at 30–32. Lady of America also argues, primarily on the basis of the contractual disclaimers, that its conduct was not sufficiently unfair or deceptive to violate FDUTPA. Def. S.J. Mem. at 29–30. Plaintiffs disagree and, on motion for summary judgment, the Court cannot resolve these factual disputes in Lady of America's favor.

### E. Unjust Enrichment (Plaintiffs' Count VII)

Plaintiffs allege in Count VII that Lady of America was unjustly enriched as a result of plaintiffs' having been persuaded to open Lady of America franchises. First Am. Compl. ¶ 316. Lady of America has not made a freestanding argument as to why the Court should grant summary judgment in its favor on this claim. Rather, Lady of America argues only that if the Court grants summary judgment in its favor on the rest of plaintiffs' claims, the Court should also grant summary judgment as to plaintiffs' unjust-enrichment claim. Def. S.J. Mem. at 37. Because the Court is denying summary judgment on some claims, it also denies summary judgment as to unjust enrichment.

### F. Fraud (Plaintiffs' Count VIII)

 Plaintiffs allege in Count VIII that Lady of America defrauded them. First Am. Compl. ¶¶ 318–19. Lady of America makes a single argument in response: In light of the contractual integration and disclaimer clauses—which, according to Lady of America, render any reliance on allegedly fraudulent representations unreasonable as a matter of law—Lady of America is entitled to summary judgment on plaintiffs' fraud claims. Def. S.J. Mem. at 34–37.

Neither Lady of America nor plaintiffs identify which state's law they believe applies to plaintiffs' fraud claims. This is not a minor omission, as states do not agree about the impact of integration and disclaimer clauses on fraud actions. *See* Note, *A Proposed Penalty Default Rule Governing a Seller's Ability to Disclaim Liability for Precontractual Representations,* 1997 Colum. Bus. L.Rev. 399, 399 ("The U.S. courts are currently split over their treatment of reliance-disclaimer provisions in purchase agreements.") But because the victims of Lady of America's alleged fraud are all Minnesota citizens, and because Minnesota has a strong interest in protecting its citizens from being defrauded, the Court finds that Minnesota law applies to plaintiffs' fraud claims. *See Clements Auto Co. v. Serv. Bureau Corp.,* 444 F.2d 169, 175 n. 3 (8th Cir.1971) ("Minnesota conflicts law would apply Minnesota law to the tort action of fraud."). Applying Minnesota law, the Court further finds that Lady of America is not entitled to summary judgment on plaintiffs' fraud claims.

 As an initial matter, it is unclear whether reasonable reliance—as opposed to actual reliance—is an element of a fraud

not open until January 2003, Hoglund–Ross Aff ¶ 24, so FDUTPA claims related to that club—if any are being brought—are not time-barred.

claim under Minnesota law. The canonical formulation of the elements of fraud under Minnesota law comes from *Davis v. Re–Trac Manufacturing Corp.*, 276 Minn. 116, 149 N.W.2d 37 (1967). The Minnesota Supreme Court in *Davis*, adopting the language of the Eighth Circuit's opinion in *Hanson v. Ford Motor Co.*, stated the elements of fraud under Minnesota law as follows:

1. There must be a representation;
2. That representation must be false;
3. It must have to do with a past or present fact;
4. That fact must be material;
5. It must be susceptible of knowledge;
6. The representer must know it to be false, or in the alternative, must assert it as of his own knowledge without knowing whether it is true or false;
7. The representer must intend to have the other person induced to act, or justified in acting upon it;
8. That person must be so induced to act or so justified in acting;
9. That person's action must be in reliance upon the representation;
10. That person must suffer damage;
11. That damage must be attributable to the misrepresentation, that is, the statement must be the proximate cause of the injury.

149 N.W.2d at 38–39 (quoting *Hanson v. Ford Motor Co.*, 278 F.2d 586, 591 (8th Cir.1960)). Element 7—"The representer must intend to have the other person induced to act, or justified in acting upon it"—is hard to follow: What could it mean to "*have* the other person ... *justified* in acting upon" a representation? But Element 7 is written in the disjunctive: The representer must *either* "have the other person induced to act" (no mention of "justifiable") *or* "have the other person ... justified in acting" (whatever that means).

Element 8 is likewise written in the disjunctive—"That person must be so induced to act *or* so justified in acting"—and thus likewise does not seem to require that the reliance be justifiable.

In a more recent formulation of the elements of fraud, the Minnesota Supreme Court again used the disjunctive in paraphrasing the reliance element as requiring that "the claimant was induced to act *or* justified in acting in reliance on the representation...." *Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 747 (Minn. 2000) (emphasis added). At least one state trial court has held, based on *Martens*, that "to establish fraudulent representation, a claimant need not prove that she was justified in acting in reliance on a representation if she can prove that she was induced to act on it." *Berglund v. RE/MAX N. Cent., Inc.*, No. 27–CV–05–12567, slip op. at 6 (Minn. Dist. Ct.—Hennepin County, Oct. 23, 2006). If Minnesota law indeed allows fraud victims to recover even if they rely unreasonably on fraudulent statements, then disclaimers like those at issue in this case could *never* be effective to defeat a fraud claim. This conclusion is arguably implicit in *Clements*, in which the court observed that the defendant "concede[d] that a merger and disclaimer provision does not preclude liability for intentional fraud." 444 F.2d at 177 n. 7.

Moreover, to require in fraud cases that reliance be reasonable would be to require that a fraud victim not act negligently (i.e., unreasonably) in relying on a fraudster's statements. Such a requirement would be inconsistent with the Minnesota Supreme Court's decision in *Florenzano v. Olson*, 387 N.W.2d 168 (1986). The court held in *Florenzano* that comparative negligence is a defense to negligent misrepresentation. *Id.* at 176. By contrast, the court characterized fraud as "an intentional tort," *id.* at

173, and observed, "[w]ithout question, principles of comparative negligence would not apply to an intentional tort; we have never so applied them," *id.* at 175. The court further observed, "[w]e also consider it bad policy to permit an intentional tort-feasor the defense of comparative negligence merely because he or she chooses a gullible or foolish victim." *Id.* at 176 n. 7. In this case, Lady of America's disclaimer defense boils down to the claim that its victims were gullible or foolish if they relied on Lady of America's representations after having signed a franchise agreement in which Lady of America said, in effect, "Trust nothing that we have said that is not found in this agreement."

Notwithstanding all of this, Minnesota cases have routinely discussed "justifiable reliance" as if it were an element of a claim for fraud. In *Veit v. Anderson*, for example, the Minnesota Court of Appeals stated matter-of-factly that in fraud cases, "[t]he damaged party's reliance on the false representation must also be reasonable." 428 N.W.2d 429, 432 (Minn.Ct.App. 1988); *see also St. Croix Printing Equip. v. Rockwell Int'l Corp.*, 428 N.W.2d 877, 881 (Minn.Ct.App.1988) ("Moreover, *justifiable reliance* is essential to any form of relief for misrepresentation."). It is difficult to square *Veit's* assertion that a plaintiff must prove reasonable reliance with *Florenzano*. Moreover, as explained above, requiring "justifiable reliance" is consistent with neither *Davis* nor *Martens*. Minnesota law should be clear on this matter—after all, fraud claims are hardly uncommon—but it is not.

Judge Frank Easterbrook has wrestled with a similar problem, attempting to reconcile the requirement of "justifiable reliance" in securities-fraud cases with the notion that securities fraud is an intentional tort. *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 528–30 (7th Cir.1985). He did so by recharac-terizing the issue as one of causation and limiting the application of a "justifiable reliance" limitation to a few clearly identified situations. *Id.* at 529 ("Liability [for securities fraud] follows from willful material misstatements or omissions plus causation, not from 'justifiable reliance' in the common sense of that term."); *id.* at 529–30 (summarizing three circumstances in which "even lies are not actionable"). Perhaps Minnesota cases on the reliance requirement for common-law fraud can be reconciled along the lines suggested by Judge Easterbrook with respect to securities fraud.

In any event, the Court need not decide the question in this case. If Minnesota does not require fraud plaintiffs to prove justifiable reliance, then the franchise agreement's disclaimers are essentially irrelevant. And if Minnesota does require fraud plaintiffs to prove justifiable reliance, then the franchise agreement's disclaimers do nothing more than create an issue of fact for the jury. As discussed at length above in connection with plaintiffs' claims under the Minnesota Franchise Act, Minnesota courts (and federal courts applying Minnesota law) have held on many occasions that contractual disclaimers do not, as a matter of law, relieve those accused of fraud of liability. *See Commercial Prop. Invs., Inc. v. Quality Inns Int'l, Inc.*, 938 F.2d 870, 875–77 (8th Cir.1991); *Gen. Corp. v. Gen. Motors Corp.*, 184 F.Supp. 231, 239 (D.Minn.1960); *Weise v. Red Owl Stores, Inc.*, 286 Minn. 199, 203–04, 175 N.W.2d 184 (1970); *Veit*, 428 N.W.2d at 433; *St. Croix Printing*, 428 N.W.2d at 882; *Johnson Bldg. Co. v. River Bluff Dev. Co.*, 374 N.W.2d 187, 194–95 (Minn.Ct.App.1985). The bottom line is that the Court cannot grant summary judgment to Lady of America on plaintiffs' common-law fraud claims.

### G. Lady of America's Counterclaims for Breach of Contract

Lady of America argues, and plaintiffs do not contest, that plaintiffs have failed to live up to their contractual obligations in various ways. Def. S.J. Mem. at 37–38; Pl. S.J. Opp. at 45–46. Plaintiffs, however, argue that the franchise agreements should be rescinded as a result of Lady of America's violations of the Minnesota Franchise Act. Pl. S.J. Opp. at 45–46. If plaintiffs' contracts are rescinded, Lady of America will not be entitled to breach-of-contract damages.

Plaintiffs' claims under the Minnesota Franchise Act, along with a number of other claims, remain viable. It is thus possible that plaintiffs will be able to demonstrate at trial that they are entitled to rescission of their franchise agreements. The Court therefore denies summary judgment to Lady of America on its breach-of-contract counterclaims.

### ORDER

Based on the foregoing and on all the files, records, and proceedings herein, defendant's motion for summary judgment [Docket No. 76] is GRANTED IN PART and DENIED IN PART as follows:

1. Defendant's motion for summary judgment is GRANTED IN PART with respect to Count I as follows:

a. To the extent that plaintiffs' claims under the Minnesota Franchise Act rely on allegations about vendor rebates, those claims are DISMISSED WITH PREJUDICE AND ON THE MERITS.

b. Plaintiffs' claims for failure to register under the Minnesota Franchise Act are DISMISSED WITH PREJUDICE AND ON THE MERITS.

2. Defendant's motion for summary judgment is GRANTED IN PART with respect to Count II as follows: With respect to all plaintiffs except Deborah Randall, plaintiffs' claims under the Florida Franchise Act (Fla.Stat.Ann. § 817.416) are DISMISSED WITH PREJUDICE AND ON THE MERITS.

3. Defendant's motion for summary judgment is GRANTED IN PART with respect to Count III as follows:

a. To the extent that the claims of plaintiffs Leo Neudecker, Audrey Hoglund–Ross, and Angie Weeks under the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. Ann. § 501.201 et seq.) rely on violations of the FTC Franchise Rule (16 C.F.R. § 436.1), those claims are DISMISSED WITH PREJUDICE AND ON THE MERITS.

b. To the extent that plaintiffs' claims under the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. Ann. § 501.201 et seq.) rely on allegations about vendor rebates, those claims are DISMISSED WITH PREJUDICE AND ON THE MERITS.

c. To the extent that the claims of plaintiffs Audrey Hoglund–Ross and Angie Weeks rely on alleged projections by Lady of America of the opening-day performance of their Columbia Heights club, those claims are DISMISSED WITH PREJUDICE AND ON THE MERITS.

4. Defendant's motion for summary judgment is DENIED in all other respects.